## COMMONWEALTH vs. RAMON CORTEZ.

Middlesex. September 9, 2002. - November 8, 2002.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & SOSMAN, JJ.

*Evidence,* Expert opinion, Sexual conduct, Exculpatory, Relevancy and materiality, Hearsay. *Rape-Shield Statute. Practice, Criminal,* Instructions to jury, Admissions and confessions, Capital case. *Homicide. Constitutional Law,* Assistance of counsel.

At a criminal trial, the judge did not err in admitting expert opinion testimony of a police officer concerning bloody marks and footwear impressions at the crime scene, where defense counsel was informed adequately in advance of trial that the police officer would be testifying to these matters; where the police officer was qualified to render expert testimony on footwear impressions and patterns; where the officer's opinions were based on admissible evidence; and where the officer's opinion, although helpful in proving the ultimate issue, was not his opinion concerning who was the perpetrator. [125-129]

At the trial of indictments for murder and assault with intent to rape, the judge did not err in applying the rape-shield statute to exclude allegedly exculpatory evidence, where consensual intercourse days before the victim's murder was not relevant, as it would not have explained the fresh injuries sustained by the victim at the time of her murder. [129-130]

At a criminal trial, the judge did not err in failing to declare a mistrial, where testimony that disclosed that the defendant had been incarcerated previously was struck immediately after it was given, the jury was instructed to disregard struck testimony, and the defendant could not have been prejudiced by the testimony. [130]

There was no merit to a criminal defendant's contention that statements constituting multiple hearsay, regarding the inability of the defendant's wife to testify to the defendant's activity on the night of the crime, were improperly admitted at trial, where the contested statements were properly admitted as admissions of the defendant. [130-131]

At a murder trial, the judge properly declined to instruct the jury on voluntary manslaughter, where the victim was stabbed twenty-two times and there was no evidence of provocation. [131]

This court declined to address a criminal defendant's contention that his trial counsel was ineffective in failing to call a fingerprint technician to testify, where the issue was not presented to the trial judge in the form of a motion for a new trial. [131]

INDICTMENTS found and returned in the Superior Court Depart-

ment on November 7, 1996, and December 26, 1996, respectively.

The cases were tried before *Robert Malcolm Graham*, J.

*Robert A. George* for the defendant.

*Marguerite T. Grant*, Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant was convicted by a jury of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder (with an uncharged attempted aggravated rape as the predicate felony). He was also convicted of assault with intent to rape. On appeal, he claims errors by the trial judge in (1) admitting expert opinion testimony of a police officer concerning bloody marks and footwear impressions at the crime scene; (2) applying the rape-shield statute to exclude exculpatory evidence; (3) failing to declare a mistrial or to strike testimony disclosing that the defendant had previously been incarcerated; (4) admitting multiple hearsay regarding the inability of the defendant's wife to testify to the defendant's activity on the night of the crime; and (5) refusing to instruct the jury regarding voluntary manslaughter. The defendant also maintains that his trial counsel was ineffective in failing to call a fingerprint technician to testify. The defendant requests that we set aside the convictions. We decline to do so. We affirm the convictions and decline to exercise our power under G. L. c. 278, § 33E.

1. *Facts.* We recite the facts the jury could have found, reserving further details for discussion in conjunction with the specific issues raised. On the night of October 5, 1996, the victim met the defendant at a café in Lowell. After talking for about two hours the two left together, telling a friend of the victim that the defendant was going to adopt one of the victim's kittens. The next day, after the victim failed to report for work, the victim's landlord discovered her body lying on her living room floor. The victim's clothing had been cut open. She had received a total of twenty-two knife wounds (eleven of which were potentially fatal) as well as numerous scrapes, bruises, and defensive injuries. The defendant's fingerprints were found at the scene along with bloody footwear impressions consistent with the defendant's shoe size. There were no signs of forced

entry. Witnesses contradicted the defendant's account of his whereabouts on the night of October 5, and the defendant subsequently confessed to a fellow inmate, who testified against him at trial.

2. *Admission of testimony concerning bloody marks and footwear impressions at the crime scene.* The defendant claims that the judge improperly permitted Lieutenant Brian O'Hara of the Massachusetts State police to testify that bloody marks across the floor of the victim's apartment were made by the victim's heels; that the scene was "staged" by the perpetrator placing clothing over the blood stains[1]; and that footwear impressions at the scene were consistent with the defendant's shoe size. He claims that the defense had not received notice that O'Hara would be testifying to these matters; O'Hara was not qualified to render these opinions; the opinions were not based on admissible evidence; and the witness opined in regard to the ultimate question in the case.

The record leaves no doubt that defense counsel was informed adequately in advance of trial that the Commonwealth's theory of the case was that the defendant killed the victim in the bedroom and then dragged her through the kitchen and into the living room. Trial in the case began December 3, 1997; over one year before, on November 18, 1996, the Commonwealth filed its "statement of the case" which included a description of the above theory. The "statement of the case" also detailed that the defendant left his fingerprints on the bedroom door jamb and his shoe prints in the bloody drag marks. O'Hara testified before the grand jury (and there is no suggestion that the defendant did not receive the grand jury transcript) that the victim had been "dragged from the bedroom into the living room." He also agreed that the size of boots found at the defendant's apartment was "within the size range of the footwear impression" he had seen at the victim's apartment.

Additional discovery further defined the Commonwealth's

---

[1]The defendant's brief does not make clear what this argument about "staging" the scene means. In any event, the argument is made only in passing, unsupported by reference to any specific evidence. Lieutenant O'Hara never testified that the perpetrator staged the scene or tried to cover up the blood stains. Thus, we do not consider this contention further.

theory. In its opposition to the defendant's motion to dismiss the assault with intent to rape indictment, filed in the spring of 1997,[2] the Commonwealth stated that the victim had bled to death in her bedroom, her "body was dragged from the bedroom, through the kitchen . . . and into the living room . . . the defendant['s] fingerprints [were found] in the door jamb between the bedroom and the kitchen," and the bloody shoe prints found at the scene were consistent with the "size range" of footwear found at the defendant's apartment. The Commonwealth also provided the defendant with photographs of footwear impressions, reports of fingerprint comparison, fingerprint and footwear logs, and forensic test reports. Moreover, in her opening statement five days prior to Lieutenant O'Hara's testimony, the prosecutor referred to bloody drag marks and footwear impressions. There was no objection, register of surprise, or request for a continuance by the defendant. In these circumstances, the defendant's claim of lack of notice rings hollow.

The defendant did not object to O'Hara's qualifications when he testified regarding the bloody marks made by the victim's heels as her body was dragged through the apartment.[3] Thus, we examine this contention only to determine whether there was error, and if so, whether the error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Murphy*, 426 Mass. 395, 402 (1998). This standard cannot be met, as the fact that the victim's body was dragged from one room to another is not material to the case. The defense was that

---

[2]The docket and the materials presented do not include the date the Commonwealth's opposition was filed. The defendant's motion to dismiss, however, was docketed on March 13, 1997; it was denied on April 14, 1997, and the defendant has not claimed that the Commonwealth's opposition was not actually filed.

[3]After O'Hara had testified without objection concerning the drag marks, defense counsel finally objected and argued at sidebar that his "understanding" was that the witness's testimony would be limited to fingerprints. The judge inquired whether the defendant's concern was "what he has testified to so far [or] what you think he may testify to from here on out?" Defense counsel replied with an ambiguous, "Yes." The prosecutor continued, "I was just going to ask him to identify the pictures," and the judge ruled, "Right. You may continue." Further testimony on this matter was limited to introducing the photographs without opinion regarding the drag marks and the defendant interposed no further objection.

someone else committed the murder. The opinion that marks were due to the dragging of the victim's body does not incriminate this defendant. Nor does the dragging of the body bear on the issue of extreme atrocity or cruelty. The Commonwealth's evidence indicated that the woman was stabbed to death in her bedroom, where she "bled out," and that her body was then dragged through and into other rooms. The physical evidence indicates that her body was moved from the bedroom to the living room; whether it was dragged or carried is not significant. Moreover, other witnesses testified that the bloody smears were drag marks, and the photographs make it apparent, even to a layperson, that the woman's body had been dragged through the apartment. Finally, the defendant was convicted of murder in the first degree on a theory of felony-murder, and the drag marks are not relevant to that verdict. Clearly, this evidence did not create a substantial likelihood of a miscarriage of justice.

What is incriminating is the fact that marks consistent with this defendant's footwear impressions were found in the blood marks in the apartment. In this regard, the defendant asserts that O'Hara testified beyond his expertise as a fingerprint expert because he was not qualified to render an opinion that the defendant could not be ruled out as the source of the footwear at the crime scene. When defense counsel objected to this testimony, a voir dire was conducted concerning O'Hara's experience in footwear impressions, after which the judge permitted him to opine that the defendant's shoes were consistent in size with the footwear impressions at the scene. He also permitted O'Hara to testify regarding footwear patterns and to enhancement procedures he utilized on footwear impressions.[4,5] "A trial judge has broad discretion with respect to the admission of expert testimony." *Commonwealth* v. *Fryar*,

---

[4]As to Lieutenant O'Hara's testimony as a fingerprint expert, the defendant's brief states that "it appears the defendant conceded that Trooper [*sic*] O'Hara was an expert in fingerprint analysis," and his qualifications in this area can hardly be questioned.

[5]Although "[t]he correspondence between boots and footprints is a matter requiring no peculiar knowledge, and to which any person can testify," *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 133 (1875), O'Hara testified to significantly more than the correspondence between footwear and footprints left at the scene.

425 Mass. 237, 251, cert. denied, 522 U.S. 1033 (1997), quoting *Commonwealth* v. *Dockham*, 405 Mass. 618, 628 (1989). Lieutenant O'Hara had spent fifteen years with the State police working with fingerprints. He testified to extensive training in fingerprints and to the fact that he taught seminars throughout Massachusetts for the Criminal Justice Council and for the State police. He indicated that part of the training in the recovery of fingerprints involves footprints and that fingerprint courses that he had taken included training in footprint recovery. He also stated that, in addition, he went to a four-day course in Rhode Island taught by the Northeast Forensic Science Association where he was trained by "footwear experts and tire experts throughout the country"; he had attended other seminars taught by the International Association of Identification on Footwear and by Federal Bureau of Investigation experts; he had examined crime scenes to detect footwear impressions; he was familiar with the assembly or manufacture of footwear; and he had previously "testified a few times on footwear." The judge did not err in allowing O'Hara to render expert testimony on footwear impressions and patterns.

The defendant also maintains that O'Hara's opinion concerning footwear impressions was not based on admissible evidence. This ground of objection was not raised at trial. Thus, we review it only to determine whether the admission of the evidence was erroneous, and if so, whether the error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Murphy*, *supra* at 402. The testimony of Lieutenant O'Hara, together with photographs of the scene, provided evidence of the footwear impressions. O'Hara testified to having seen the marks and pointed them out on the photographs. He also testified to examining footwear, including boots, recovered at the defendant's apartment. There was no error.

The defendant further asserts that Lieutenant O'Hara opined on the ultimate issue. He did not do so. "A witness may not give an opinion regarding the culpability of the defendant." *Commonwealth* v. *Lodge*, 431 Mass. 461, 467 (2000). Lieutenant O'Hara's testimony that the defendant could not be ruled out as the person who left footprints in the victim's apartment does not identify the defendant as the culprit; it simply

eliminates those people with other shoe sizes. The testimony creates a class of suspects of which the defendant was one. That the testimony was damaging to the defendant does not render it inadmissible. It is an opinion that does help to prove the ultimate issue, but it is not the witness's opinion concerning who is the perpetrator. Cf. id.[6]

3. *Rape-shield statute.* After the medical examiner testified that the victim had suffered bruises and abrasions on her inner thighs and mons region of her genitalia, defense counsel, in cross-examining a police officer, sought to elicit evidence of an alternate source for these injuries: recent sexual intercourse between the victim and her boy friend. The victim's boy friend had told the officer that he had had intercourse with the victim forty-eight hours prior to her death. The judge ruled the evidence of this prior sexual intercourse inadmissible under the rape-shield statute, G. L. c. 233, § 21B.[7] The defendant maintains that this ruling was erroneous and deprived him of presenting exculpatory evidence on the assault with intent to rape charge.

The judge did not abuse his discretion in excluding the evidence. Pursuant to the rape-shield statute, evidence of a victim's sexual conduct is not admissible unless it is alleged to be the cause of any physical feature, characteristic, or condition of the victim. Such evidence is admissible, however, only after an in camera hearing "on a written motion for admission of same and an offer of proof." G. L. c. 233, § 21B. No written motion was ever filed; nor was a request for the appropriate hearing made. See *Commonwealth* v. *Pearce*, 427 Mass. 642, 648-649 (1998). Apart from these failures to comply with statutory preconditions to admissibility, the defendant never contested the evidence that the injuries in question were fresh (and thus could not have been the result of sexual intercourse

---

[6]To the extent that the defendant claims that Lieutenant O'Hara's testimony regarding the bloody drag marks made by the victim's heels was not based on admissible evidence and that he opined on the ultimate issue, again this defendant was not incriminated by such testimony.

[7]This testimony was also inadmissible as hearsay. The hearsay problem was remediable, as the boy friend was a witness at trial. But even if the defendant sought to question the boy friend regarding the intercourse (as direct testimony of the boy friend's own experience, thus curing any hearsay problem), such testimony still would not have been admissible on grounds of relevance and the rape-shield statute.

two days earlier) or that there were bloody fingermarks on the victim's thighs and that her shirt and bra had been cut from her body. The judge properly ruled that consensual intercourse days before the victim's murder was not relevant as it would not have explained these injuries.

4. *Statement regarding the defendant's prior incarceration.* The defendant claims that the judge erred by failing to strike the testimony of a Commonwealth witness, Daryn Dupree, that the defendant had "just got out of jail." The judge did strike the challenged testimony. After the witness made the improper statement, counsel objected and requested to be heard at sidebar. The judge then said: "Sure, come on over. All right. I'll strike it, and I'm just going to instruct the witness that what the district attorney is looking for here is for your observation of his face, the way he spoke, or the words he spoke." The witness attempted to say something further, but the judge cautioned: "All right, don't answer anything now." The sidebar conference was then conducted; defense counsel moved to strike the testimony and for a mistrial. The judge ruled "denied." All the denial referred to was the motion for a mistrial.

The judge ruled properly. He struck the testimony immediately after it was given, as he should have. Further, both at the outset of the trial, and in his final instructions to the jury, he had informed the jurors that they were to disregard struck testimony. We presume that the jury follow the judge's instructions. *Commonwealth* v. *Degro*, 432 Mass. 319, 328 (2000). There was no necessity for a mistrial.

Moreover, the defendant could not have been prejudiced by this statement. When the defendant testified, the Commonwealth impeached him with a 1986 conviction of unlawfully carrying a firearm. At that time, the judge instructed the jury not to draw any inference of guilt against the defendant because of his prior record. The judge also cautioned the jury about not drawing any improper inference from the fact that the defendant had been held in jail awaiting this trial (evidence admitted that the defendant does not contest).

5. *Multiple hearsay.* The defendant avers that the judge erred by admitting statements that constituted multiple hearsay. The statements were properly admitted as admissions of the

defendant. See *Commonwealth* v. *Morgan*, 422 Mass. 373, 379-380 (1996). The contested statements were by the witness Dupree, who stated that the defendant had told him that he was with "his girl" at the time of the crime, but that there was a two-hour period for which "his girl" could not account. The statement was not that of the defendant's "girl," but of the defendant.

6. *Voluntary manslaughter.* The defendant maintains that the judge should have instructed the jury on voluntary manslaughter. Contrary to the defendant's contention, any alleged absence of evidence of attempted rape is not relevant to whether evidence existed to support a voluntary manslaughter instruction. The defendant denied killing the victim or ever being in her apartment. The victim was stabbed twenty-two times. There was no evidence of provocation and the judge properly declined to instruct on voluntary manslaughter. See, e.g., *Commonwealth* v. *Rosado*, 434 Mass. 197, 204-205, cert. denied, 534 U.S. 963 (2001) (brutal beating inflicted over four days).

7. *Ineffective assistance of counsel.* Lieutenant O'Hara testified that two latent fingerprints found inside the victim's apartment were those of the defendant. Defense counsel attempted to impeach O'Hara with the contrary conclusion contained in a report of a State police fingerprint technician. The judge did not permit this cross-examination, ruling that such testimony could be elicited only through the technician himself. The defendant claims that defense counsel's failure to summons the technician constituted ineffective assistance of counsel. This issue was not presented to the judge in the form of a motion for a new trial and thus is not properly before us. Whether there was a strategic reason for counsel's action requires fact finding and must be undertaken by the trial judge. See *Commonwealth* v. *Waite*, 422 Mass. 792, 807 (1996); *Commonwealth* v. *Williams*, 378 Mass. 217, 238 (1979).

8. *Relief pursuant to G. L. c. 278, § 33E.* We have considered the entire record pursuant to our obligation under G. L. c. 278, § 33E. There is nothing that would require us to exercise our authority to reduce the jury's verdict of murder in the first degree or to order a new trial.

*Judgments affirmed.*