## COMMONWEALTH *vs.* ODON "DANNY" DoVALE.

No. 01-P-608.

Suffolk. November 19, 2002. - March 26, 2003.

Present: LAURENCE, KASS, & RAPOZA, JJ.

*Larceny. Securities,* Sale. *Fraud. Evidence,* Inflammatory evidence, Redirect examination, Guilty plea. *Witness,* Redirect examination. *Practice, Criminal,* Plea, Instructions to jury.

At the trial of indictments charging the defendant with larceny of property worth more than $250, securities fraud, wilfully overstating a company's assets with intent to defraud, and keeping a "bucket shop" or engaging in "bucketing" transactions, the judge did not abuse his discretion in admitting in evidence the testimony of a coworker of the defendant to the effect that the defendant had propositioned him to assist in laundering money (an indictable proposition unrelated to any crime with which he was charged), where the evidence was probative of the defendant's participation in, and fostering of, irregular and unlawful dealings by the company for which the defendant worked. [659-661]

At a criminal trial, the judge did not abuse his discretion in permitting the prosecutor on redirect examination of a witness to explain damaging testimony that had been brought out in cross-examination. [661]

The judge at a criminal trial properly refused to admit, as evidence of consciousness of innocence, the defendant's refusal to accept a motion judge's proffer of a plea bargain, because there could be many reasons why the defendant did not accept the offer. [661-663]

At a criminal trial, the judge did not err in giving an instruction to the jury with regard to one codefendant, but not with regard to another codefendant, where there was a reason to differentiate between the two defendants. [663]

INDICTMENTS found and returned in the Superior Court Department on June 20, 1996.

The cases were tried before *Patrick J. King,* J.

*Michele R. Moretti* for the defendant.

*Pamela L. Hunt,* Assistant Attorney General, for the Commonwealth.

KASS, J. Odon "Danny" DoVale was convicted by a jury of

participation in a sham currency trading operation, London & Global Group, Inc. (L&G), that diverted into the hands of L&G's principal officers money that customers had paid into their L&G accounts. Specifically, the indictments on which the jury returned verdicts of guilty against DoVale were (1) larceny of property worth more than $250 (G. L. c. 266, § 30); (2) securities fraud (G. L. c. 110A, § 101); (3) wilfully overstating a company's assets with intent to defraud (G. L. c. 266, § 92); and (4) keeping a "bucket shop" or engaging in "bucketing" transactions (G. L. c. 271, §§ 35, 36).[1] On his appeal, DoVale claims error in three evidentiary rulings by the trial judge and an error, not objected to, in the jury instructions.[2] We affirm.

*Facts.* There was evidence that L&G conducted a currency trading operation in London, England. DoVale, a Brazilian national, was dispatched to Massachusetts in August, 1994, by L&G to help set up an office in Boston. He identified himself as a head manager. L&G set up shop in a third-floor office at 105

---

[1]Keeping a bucket shop and bucketing are relatively esoteric offenses. There are only three references to the statutory offenses in the case reports: *Chandler* v. *Prince*, 221 Mass. 495, 511 (1915); *Commonwealth* v. *Glassman*, 253 Mass. 65, 69-71 (1925); and *Leonard* v. *Hunt*, 36 F.2d 13, 14 (1st Cir. 1929). A simplified description of bucketing is when a broker undertakes to buy a security for a customer at a certain price, but does not immediately buy the security. The bucketer might ultimately buy the security for less and keep the difference. See G. L. c. 271, § 35, which defines the practice. Section 36 makes it an offense. An explanation of why the forbidden practice is called "bucketing" is that a securities trading business that indulged in it would make trades all day long, throw the ticket that memorialized the trade into a bucket, and decide at the end of the day which accounts to credit or debit with winning and losing trades. Bucket shops are sometimes called "boiler rooms," according to one Internet site devoted to financial investment education. See http://www.investopedia.com/terms/b/bucketshop.asp (last visited Mar. 24, 2003). Another, more fragrant, etymological explanation for the term cites the practice of carrying beer into brothels in buckets. See Gastineau, Dictionary of Financial Risk Management 44 (1992), available at http://www.amex.com/dictionary (last visited Mar. 24, 2003).

[2]The judge imposed concurrent sentences of thirty to thirty-six months on the first three charges. The indictment charging bucketing or operating a bucket shop was placed on file with the defendant's consent. Against those sentences, DoVale received a credit of 626 days for time served while awaiting and standing trial. The sentences were imposed May 26, 1998. DoVale has served the sentences, but his appeal is not moot because of the record he is left with if the judgments of conviction are affirmed. A codefendant at trial, Edward Lau, was acquitted.

Chauncy Street, Boston. There was a room full of computers for training sessions in currency trading and another glass-enclosed room in which traders conducted actual currency transactions — or so they thought. Clocks on the wall announced the times in London, Paris, and Hong Kong. A brochure breathlessly described (in Chinese, English, and French) L&G's offices in London, Paris, Hong Kong, and Vancouver, Canada. "The London and Global record of success," the brochure proclaimed, "is demonstrated by its fast growing client base of international names supporting its desire to become one of the world's leading global financial groups." L&G, through its Boston representatives, including DoVale, represented that it had twenty million pounds on deposit with the Bank of England. That deposit, L&G's promoters represented, enabled L&G to trade in foreign exchange on behalf of customers who opened trading accounts with as little as $10,000.

L&G's modus operandi was to advertise for persons who desired to be trained as foreign currency traders. An accomplished trader, L&G told one prospect, might earn $250,000 in a year. Trainees were urged by DoVale, among others, to open accounts and trade for their own account. In addition, the persons recruited and trained as traders were urged to bring in customers. DoVale led a trading group.

It was all a scam. There was no deposit with the Bank of England. There were no trades in English pounds, German deutsch marks, or Swiss francs. The trading computers effected no trades. In general, trainees and customers were unsuccessful in their "trading" and sustained losses. If they desired to close their accounts, L&G was cooperative and returned their residual balances. The cash representing "losses" flowed into the pockets of the promoters of L&G. Before it was over in February, 1996 — when the Attorney General shut it down — 136 customers had parted with some $1,300,000.

In his opening, counsel for DoVale asked rhetorically, "[W]as this a scam?" and answered, "Absolutely." DoVale's defense was that he did not know the operation was a fraud and that he had been taken along with the other "marks."

1. *Admission of evidence that DoVale propositioned an employee to assist in laundering money.* Over objection, David

Kim, who had been an "account executive" at L&G, testified that toward the end of 1995, DoVale had called him to DoVale's office. There DoVale produced from a desk drawer a bundle of cash packaged as a brick from eight to ten inches thick. DoVale explained this was the company's money. For "tax reasons" he asked Kim to deposit the cash to his — Kim's — checking account and to write checks to L&G when it requested funds. For that service, he would be compensated by a percentage of the money Kim deposited in his bank. Kim declined.

Counsel for DoVale had objected to this evidence on the ground that it described DoVale as making an indictable proposition unrelated to a crime with which he had been charged; hence the evidence was unfairly prejudicial. The argument for admission was that the interview between DoVale and Kim involving the brick of cash suggested, on DoVale's part, a high level of knowledge about how L & G was run and a high level of responsibility in its running. That was relevant to rebut DoVale's defense that he was only a low level soldier in the service of L & G; that, indeed, he was among the lambs who had been fleeced.

Questions about the relevance of evidence and whether its probative utility is outweighed by unfair prejudicial effect are for the trial judge to decide. *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 24 (1990). *Commonwealth* v. *Azar*, 32 Mass. App. Ct. 290, 300 (1992). An appellate court does not disturb a ruling on such questions unless it sees palpable error. *Ibid.* We have already touched on why DoVale's proposition to Kim was relevant to how deeply DoVale was involved in L&G's affairs. The interview with Kim at which DoVale exhibited the brick of cash was probative of DoVale's participation in, and fostering of, irregular and unlawful dealings by L&G. See *Commonwealth* v. *Charles*, 428 Mass. 672, 682 (1999); *Commonwealth* v. *Cintron*, 435 Mass. 509, 515 (2001); *Commonwealth* v. *Young*, 56 Mass. App. Ct. 60, 68 n.9 (2002). DoVale's knowledge and participation in the felonious enterprise that was being carried on under the banner of L&G was the central issue in the case, and the money laundering proposition by DoVale tended to prove that knowledge and participation. Although the particular

offense that DoVale's interview with Kim describes, money laundering, is not one with which he had been charged, the conduct was in aid of the sham currency trading operation and, therefore, relevant to the offenses for which DoVale was standing trial. The judge did not abuse his discretion in admitting evidence of DoVale's money laundering proposition to Kim. See *Commonwealth* v. *Fallon*, 423 Mass. 92, 97-98 (1996). Contrast *Commonwealth* v. *Mills*, 47 Mass. App. Ct. 500, 506-507 (1999).

2. *Redirect examination of Jefferson Thomas.* The direct testimony of Jefferson Thomas, a trainee, spoke primarily to the teaching functions of a codefendant, Edward Lau, and the defendant DoVale. His evidence was susceptible of inference that DoVale was more than a mere cog in the machinery. Thomas testified that he lost approximately $20,000 or $25,000 he had put into a trading account. On his direct examination, he also said he had a personality conflict with DoVale. During his cross-examination, DoVale's counsel questioned Thomas about whether a personality conflict had developed between him and DoVale and whether Thomas had transferred to a different training group for that reason.

On redirect examination, the prosecutor, with permission of the trial judge, was permitted to explore the personality conflict between Thomas and DoVale. On the whole, the redirect examination produced little other than that hostility had developed between Thomas and DoVale, in part because DoVale made slighting racially charged remarks, and in part because DoVale helped himself to the use of Thomas's computer. All in all, what was raised on redirect was not very potent stuff. The judge gave a cautionary instruction that none of what the witness Thomas had said on redirect examination was to be regarded for its truth, but only to show why, in Thomas's mind, he had a falling out with DoVale. There was no error. The scope of redirect examination lies within the sound discretion of the trial judge. *Commonwealth* v. *Gordon*, 407 Mass. 340, 352 (1990). A witness may explain damaging testimony brought out in cross-examination. *Commonwealth* v. *Plouffe*, 52 Mass. App. Ct. 543, 546 (2001).

3. *Consciousness of innocence.* At a pretrial hearing on a mo-

tion to dismiss brought under Mass.R.Crim.P. 36, 378 Mass. 909 (1979), the motion judge made a proffer to DoVale that if he were to plead guilty, he would sentence him to the time he had already served awaiting trial.[3] "The effect of that will mean, Mr. DoVale," the judge said, "that you will be a free man by five o'clock today, and this will be behind you." DoVale declined the offer. Trial counsel sought to have admitted in evidence DoVale's refusal of the time-served offer as consciousness of innocence. The trial judge excluded evidence of the plea bargain proposal, stating that "plea discussions are not admissible." This was the reciprocal, the judge observed, of the principle that a defendant's offer to plead guilty for a short sentence cannot be put in evidence as consciousness of guilt. See Mass.R.Crim.P. 12(f), 378 Mass. 870 (1979).

DoVale suggests that because rule 12(f) expressly declares inadmissible the offer to plead guilty and says nothing about the admissibility of evidence of a refusal so to do, we should infer that evidence of refusal is not barred. We take rule 12(f) to state the larger proposition, that a statement made in connection with a proposal for a plea shall not be evidence at trial. Exploration of plea bargains would be grievously inhibited if proposals aired by the parties or the judge were to be used at trial as the basis for an inference of guilt or innocence. See Model Code of Pre-Arraignment Procedure § 350.7 (1975); ABA Standards for Criminal Justice, Pleas of Guilty, Standard 14-3.4(c) commentary at 139 & n.4 (3d ed. 1999). Our cases have treated evidence purporting to show consciousness of innocence as of little value because there are many reasons why a person does not flee or accept an attractive plea offer. *Commonwealth* v. *Oeun Lam*, 420 Mass. 615, 620 (1995). *Commonwealth* v. *Martinez*, 437 Mass. 84, 88 n.3 (2002). *Commonwealth* v. *Martin*, 19 Mass. App. Ct. 117, 122 (1984). In the instant case, for example, the defendant was a foreign national for whom a judgment of conviction would have consequences under immigration law.

*Commonwealth* v. *Wilson*, 430 Mass. 440, 443 (1999), to which the defendant calls our attention, is not to the contrary. In that case the accused expressed a wish to plead guilty to larceny

---

[3]The motion judge was not the judge who ultimately presided at the trial.

charges to a detective at the police station. That statement, made to someone who had no authority to negotiate a plea and who had never led the accused to think so, could be admitted in evidence. By contrast, the motion judge in the instant case did have authority to make a plea proposal. We have reviewed and do not consider meritorious DoVale's argument that the exclusion from evidence of statements related to plea proposals deprived him of his constitutional right to present evidence in his defense.

4. *Bias against DoVale in the jury charge.* In the course of instructing the jury on securities fraud, the judge said as to a co-defendant:

> "You heard evidence in training sessions [that] Edward Lau merely repeated what he was told by others, and had no reason to believe what he had been told by others was false.

> "If you find this testimony credible you must find the defendant not guilty of securities fraud."

There was no objection to this portion of the instructions. On appeal, new counsel for DoVale argues that the failure to give a similar instruction mentioning DoVale left an adverse inference with the jury as to DoVale. There was a reason to differentiate between the two defendants. Lau had given testimony that he was repeating what the promoters (one of whom was his brother-in-law) had told him and that he had no reason to think their representations had been false. DoVale had not testified nor was there any other evidence that he had relied on representations he reasonably believed to be true. There was, therefore, a reason for giving an instruction that applied to Lau but was meaningless as to DoVale, as DoVale's trial counsel apparently recognized.

*Judgments affirmed.*