Commonwealth *v.* Boyarsky.

COMMONWEALTH *vs.* ERIC M. BOYARSKY.

Worcester. September 5, 2008. - December 9, 2008.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, & BOTSFORD, JJ.[1]

*Telephone. Eavesdropping. Evidence,* Telephone conversation, Sound re-
cording, Wiretap, Cumulative evidence, Relevancy and materiality, Expert
opinion. *Imprisonment,* Inmate telephone calls. *Search and Seizure,* Incar-
ceration, Electronic surveillance, Expectation of privacy. *Constitutional
Law,* Search and seizure. *Privacy. Practice, Criminal,* Plea, Motion to sup-
press, Admissions and confessions, Capital case. *Waiver. Mental Impairment.*

The judge at a murder trial did not err in admitting in evidence electronic re-
cordings of telephone calls that the defendant made while he was in jail
awaiting trial, where, for those calls during which the person who initially
answered the call did not pass the telephone to a third person, there was no
secret recording within the meaning of the Massachusetts wiretap act,
G. L. c. 272, § 99, in that an automated system expressly informed both
parties to the call that it would be recorded; and where, for those calls dur-
ing which the call recipient passed the telephone to a third party (and it
was not clear from the record whether the third party actually knew the
call was being recorded), suppression was not required because the Depart-
ment of Correction (department), which recorded the calls, did not wilfully
intercept the calls within the meaning of § 99, in that the department
lacked knowledge that the initial recipient had passed the telephone and
lacked power to prevent such an occurrence [703-707]; further, the defendant
failed to meet his burden of demonstrating that he had a reasonable expecta-
tion of privacy in the telephone calls [707-709].

At a criminal trial, a statement that the defendant made to a friend regarding
sentencing was in no way related to a plea negotiation, and the prosecutor's
unfortunate characterization of the statement during his closing argument
did not convert the statement into an offer to plead. [709]

At a criminal trial, the judge properly instructed the jury regarding the absence
of a recording of the defendant's interrogation [710], and acted within his
discretion in limiting cross-examination of a witness regarding this court's
jurisprudence concerning recording of interrogations [710-711].

A Superior Court judge properly denied the criminal defendant's motion to
suppress statements that he made to a State trooper, where the evidence
that the judge was entitled to credit justified his conclusion that the defendant
did not suffer panic attacks so severe as to impair his ability to waive his
Miranda rights and voluntarily to give the statements; further, the judge

---

[1]Justice Greaney participated in the deliberation on this case prior to his
retirement.

was not required to find the defendant's statement to be involuntary as a matter of law. [711-715]

At a criminal trial, the judge did not abuse his discretion in admitting in evidence expert witness testimony regarding footprint identification, where the witness's preparation and analysis of evidence used to differentiate very similar shoes were subjects appropriate for expert testimony. [715-717]

INDICTMENTS found and returned in the Superior Court Department on April 18, 2003.

A pretrial motion to suppress evidence was heard by *Timothy S. Hillman,* J., and the cases were tried before him.

*Randolph Gioia (Elizabeth Billowitz* with him) for the defendant.

*Ellyn H. Lazar-Moore,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. On January 31, 2003, Alma Karina Amezcua was beaten and stabbed to death in her fiancé's apartment in Leominster. On September 29, 2005, a jury convicted Eric M. Boyarsky of murder in the first degree on the theories of extreme atrocity or cruelty, premeditation, and felony-murder. The jury also convicted the defendant of home invasion in violation of G. L. c. 265, § 18C. On appeal, the defendant argues that (1) evidence of electronically intercepted statements he made in the course of telephone calls he placed from the Worcester County jail should have been suppressed on both statutory and constitutional grounds; (2) evidence of the defendant's statement regarding possible sentences should have been excluded as an offer to plead; (3) the trial judge erred in his evidentiary rulings and in his instructions to the jury concerning the failure of the State police to record their interrogations of the defendant; (4) evidence of the defendant's admissions to the police during their second interrogation of him should have been suppressed, because the defendant was experiencing a panic attack during the interview, and as a result, his waiver of Miranda rights was invalid and his confession was involuntary; and (5) expert testimony should not have been admitted on the issue of shoe print identification. We reject the defendant's arguments, and after reviewing the entire case, we decline to exercise our authority under G. L. c. 278, § 33E, to reduce the degree of guilt or order a new trial.

1. *Background.* The jury could have found the following facts.[2] In January of 2003, the defendant lived in Leominster, at 47 Princeton Street, building no. 5, apartment no. 136. The victim's fiancé lived in a different apartment in the same building. On the day of the homicide, the defendant "called into work sick" at his job at MAKI Electrical. At approximately 1:30 P.M., he left his apartment to go to the Searstown Mall. While still parked at the apartment complex, he saw the victim walking into building no. 5. Rather than continue to the mall, the defendant drove his truck around the block, parked, and retrieved a baseball bat from his apartment. He saw the victim walking to building no. 2, and waited outside her fiancé's apartment in building no. 5.

When the victim returned to the apartment, the defendant pushed through the open door and hit her on the head with the baseball bat; he also struck her hands and arms with the bat when she tried to defend herself. Once she fell to the ground, he continued hitting her head more than twenty times. He then stabbed the right side of her neck with a steak knife he took from the kitchen counter. When the handle of the knife broke off, he dropped it and left it with her body.

The defendant then pulled the telephone off the wall, so that no one would be able to telephone for help, and returned to his apartment. The bat had broken in half. The defendant placed the bat in a plastic bag, and put the bag inside a Nike gym bag. He drove to the Park Hill Plaza in Fitchburg, and hid the plastic bag under other trash in a dumpster.[3]

On the day of the homicide, Officer Emanuel Tocci of the Leominster police department interviewed the defendant (among other residents at the Princeton Street apartment complex), and observed scrapes on his left hand. The defendant told Tocci that the scrapes were from his work as an electrician. On February 4, 2003, the defendant gave a voluntary statement to State Troop-

---

[2]The facts concerning the defendant's conduct on the day of the victim's death are taken from the defendant's confession to a State trooper, evidence of which was presented to the jury.

[3]At a later point, State troopers, following a diagram drawn by the defendant, were able to determine that the dumpster had been emptied into the Leominster-Fitchburg landfill, where the bat could not feasibly be retrieved.

ers Daniel Richard and Thomas Poirier, in which he denied involvement in the homicide. The defendant also submitted to voluntary fingerprinting, photographing, and deoxyribonucleic acid (DNA) sampling, allowed troopers to search his truck and apartment, and provided the clothing and shoes he had been wearing on the day of the homicide.

The shoes matched a footprint found on a clipboard by the victim's body, and tested positive for human blood. On February 11, 2003, the defendant agreed to be interviewed a second time by the State police. Troopers Thomas Poirier and Thomas Ryan conducted the interview, in which they told the defendant that they now had evidence contradicting his earlier statement that he had never been in the apartment where the victim was killed. The defendant responded with a detailed confession, which was transcribed but not recorded. DNA tests later showed that the blood on the defendant's shoes was consistent with the victim's DNA profile.

The defendant did not know the victim's name, and had only spoken to her once. Asked why he killed her, he told police, "The most logical answer that I could think of is that I have had thoughts about what it would be like to kill someone." He also stated, "Everything that went on around that time is not too clear to me."

The defendant had suffered from panic attacks since 1998 or 1999. They subsided after he stopped using marijuana, and recurred sometime in 2002. In October, 2002, he was diagnosed with panic disorder and prescribed the medications Klonopin and Effexor. The attacks had largely dissipated by December, 2002, but the defendant experienced them on a daily basis following the homicide.[4]

2. *Discussion. a. Telephone recordings from jail.* The defendant argues that the Commonwealth improperly introduced in evidence electronic recordings of telephone calls he made while he was in jail awaiting trial.

Prior to trial, the defendant was held in custody in the Worcester

---

[4]We set forth additional facts in connection with particular issues discussed hereafter.

County jail in West Boylston.[5] There, he signed a form in order to use the telephone, which contained the following statement: "All calls, excluding authorized attorney calls, are subject to electronic monitoring, recording, and detailing. This information may be used for any lawful purpose." Thereafter, when the defendant made a telephone call to another party, an automated system informed him and the other party that the call was subject to monitoring and recording. The automated system did not replay this message if the party called by the defendant physically passed the telephone to a third party.

State Trooper Thomas Ryan, the case officer investigating the victim's homicide, retrieved a total of four computer disks containing the defendant's recorded telephone calls from the Worcester County jail in March and July of 2003. Ryan listened to all of the disks. Over the defendant's objection, the Commonwealth introduced six telephone calls from the disks in evidence at trial — four calls to one friend, and two calls to another. The prosecutor later argued to the jury, again over objection, that the defendant's statements during those calls showed his consciousness of guilt.[6]

In his initial brief on appeal, the defendant argues that the

---

[5]The facts set out in this paragraph in the text are based on the testimony provided by Lieutenant Peter Bove of the criminal investigations unit of the Worcester County sheriff's department, which maintains the telephone monitoring and recording system in the Worcester County jail. Bove testified during a hearing conducted by the judge without the jury.

[6]In his closing argument, the prosecutor highlighted excerpts from the six calls. Among others:

"And at [the defendant's friend's] suggestion he might get [a] five[-year sentence], what did he say? 'I'd be fucking jumping for joy. I'd be doing somersaults.' Ask yourself if an innocent man offers to do five or eight or ten years."

"[The defendant] says, 'I'm still trying to find out if they found [the bat].' And [his friend] says, 'You put it somewhere and stuff and they don't know where?' And [the defendant's] response is, 'Right.' "

"And I suggest to you that [the defendant] gave us a clue about what he thinks of his own defense. . . . [The defendant's friend] says, 'You could say you just [confessed] to shut them up, to shut the police up.' Doesn't that sound an awful lot like his defense? . . . And yet, in that phone call on June 4, 2003, when [the friend] suggests that to the defendant, what does the defendant do? He laughed. He laughed. But sometime later on, apparently, he took [the friend's] advice."

recording and transmission of his telephone calls violated the Massachusetts wiretap act, G. L. c. 272, § 99 (the act).[7] The act makes illegal the "willful[] . . . interception . . . of any wire or oral communication." G. L. c. 272, § 99 C 1. The act further prohibits wilful disclosure of "the contents of any wire or oral communication, knowing that the information was obtained through interception," G. L. c. 272, § 99 C 3, except by an "investigative or law enforcement officer . . . in the proper performance of his official duties." G. L. c. 272, § 99 D 2. The act defines "interception" to mean to "secretly record . . . the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." G. L. c. 272, § 99 B 4. A defendant "may move to suppress the contents of any intercepted wire or oral communication," among other grounds not relevant here, if "the communication was unlawfully intercepted," or "was not intercepted in accordance with the terms of this section," or the recording was "illegally obtained." G. L. c. 272, § 99 P 1, 2, 5.

The defendant argues that the recordings were made secretly and that they therefore constitute "interception[s]" under the act, because the parties to the telephone calls did not give valid consent to recording. This argument conflates two aspects of the definition of an interception under the statute, namely, that it be (1) secretly made and (2) without prior authority by all parties. G. L. c. 272, § 99 B 4. A recording that is made with the actual knowledge of all parties is not an interception, even if they have not affirmatively authorized or consented to it. *Commonwealth* v. *Jackson*, 370 Mass. 502, 507 (1976). Cf. *Commonwealth* v. *Rivera*, 445 Mass. 119, 134 (2005) (Cowin, J., concurring in part); *id* at 142 (Cordy, J., concurring).

---

[7]The defendant objected to the admission of the telephone calls in evidence at trial on the related ground that they violated Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* (Title III). See *Commonwealth* v. *Damiano*, 444 Mass. 444, 447 (2005) (applying Title III). That argument is not raised by the defendant here, and is not persuasive under Federal precedent. *United States* v. *Lewis*, 406 F.3d 11, 19 (1st Cir. 2005), cert. denied, 548 U.S. 917 (2006) (denying suppression where Plymouth County correction officer disclosed telephone recordings to State police investigator).

In this case, the recorded telephone call evidence suggests that with respect to at least four of the six calls introduced, the person answering the collect call from the defendant did not pass the telephone to anyone else; in the remaining calls, the telephone was passed to a third person. For the calls where the person who initially picked up the telephone did not pass it on, an automated system expressly informed both parties to the call that the call would be recorded. Thus, there was no interception because there was no secret recording, and the inquiry is at an end. *Commonwealth* v. *Jackson*, 370 Mass. at 507. See *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764, 772 (1996) (under telephone monitoring and recording system implemented by Department of Correction, where inmate caller and call recipient informed by automated message that call is recorded, "monitoring and recording [was] not surreptitious in any sense").

In the case of the one or more telephone call recordings where the call recipient passed the telephone to a third party, however, it is not clear that this third party actually knew the call was being recorded.[8] As for these recordings, our decision in *Commonwealth* v. *Ennis*, 439 Mass. 64, 69-70 (2003) (*Ennis*), controls.

In *Ennis*, the question raised was whether an audiotape recording by the Department of Correction (department) of a three-way telephone conversation among (1) an inmate in a house of correction, (2) another person, and (3) the defendant should be suppressed because the defendant — who was the third party added to the call — was not informed that the call was being recorded, although the two original parties to the call were so informed. *Id.* at 64-65. The court concluded that suppression was not required. The court assumed (as the Commonwealth had) that the telephone call qualified as an "interception."[9] Nevertheless, the court took the view that where the

---

[8]The best example of such a call is the March 4, 2003, conversation between the defendant and Rene Boutotte, where it is clear that Boutotte did not answer the telephone himself.

[9]The court nevertheless specifically left open the question whether an "interception" occurs in a case "where the original parties to the call . . . are informed that the call is being recorded and where the addition of a sequential party . . . is beyond the recorder's knowledge or control." *Commonwealth* v. *Ennis*, 439 Mass. 64, 66 n.5 (2003).

department could not have taken steps to prevent the defendant Ennis from joining the call as a third party, the department did not "willfully" intercept the call, and therefore, there was no "unlawful" or "illegal" interception, see G. L. c. 272, § 99 P 1 and 5, because the statute prohibits only "willful" interception. *Id.* at 67-70. As for whether the interception was not "in accordance with the terms of this section," G. L. c. 272, § 99 P 2, the court determined that, even if this were so, in the circumstances, suppression was not warranted because there was nothing to indicate the Commonwealth was responsible for the noncompliance. *Id.* at 70.

Turning to this case, if, as in *Ennis*, we assume for argument that there was an "interception" — and if we further assume that the defendant, who knew of the recording, has standing to challenge the admission of the calls because some third party may not have heard the initial warning and may not have been aware of the recording — none of the possible grounds for suppression under G. L. c. 272, § 99 P, applies. There is no evidence that those responsible at the jail for recording calls had any knowledge that the initial recipient of the defendant's telephone call had passed the telephone to someone else, and no evidence in any event that the jail had any power to prevent such an occurrence. As was true in *Ennis*, the absence of knowledge, power, and control on the jail's part signifies that the interception could not be deemed wilful. And "[b]ecause there was no wilful conduct by the [jail], there was no 'unlawful' or 'illegal' interception . . . ." *Id.* at 70, quoting G. L. c. 272, § 99 P 1, 5. Moreover, even if the telephone conversations were "not intercepted in accordance with the terms of" the act, G. L. c. 272, § 99 P 2, "[t]here is nothing to indicate that the Commonwealth was culpable, or even negligent, and '[n]o deterrent purpose would be served by suppressing the intercepted conversations,' " *Ennis, supra,* quoting *Commonwealth* v. *Santoro,* 406 Mass. 421, 423 (1990), precisely because the jail had no knowledge or ability to prevent the third party from taking over the call.

In his supplemental brief, the defendant advances a new argument: that the Worcester County sheriff's disclosure and transmission of his recorded telephone calls to the State police vio-

lated his rights of privacy and due process protected by the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights.[10] The defendant raised this argument for the first time on March 3, 2008, by a motion to file the supplemental brief. The argument was prompted by a Superior Court judge's decision in another case that was issued after the filing of initial briefs in this case.

The Commonwealth argues that the defendant has waived any claim of constitutional violations based on the disclosure of the recorded telephone calls to the State police (and ultimately to the district attorney), because he never raised the hint of such a claim below. The defendant contends that his constitutional argument "could not have been reasonably raised earlier," because counsel "could not have anticipated[] the Superior Court's landmark ruling." See *DeJoinville* v. *Commonwealth*, 381 Mass. 246, 248 (1980). In any event, in a case of murder in the first degree when an issue or argument was not raised below, we "review it pursuant to G. L. c. 278, § 33E, only to determine whether, if there was error, such error created a substantial likelihood of a miscarriage of justice." *Commonwealth* v. *Leahy*, 445 Mass. 481, 487 (2005).

The defendant's new argument is that his constitutionally protected rights to privacy and fundamental fairness have been violated. But "the burden is initially on the defendant[] to demonstrate that [he] had a reasonable expectation of privacy . . . . Thus, if the record is unclear . . . it is the defendant[] — not the Commonwealth — who [has] failed to meet [his] burden of proof . . . ." *Commonwealth* v. *Netto*, 438 Mass. 686, 697 (2003). The record here does not reveal what, if any, policy the Worcester County sheriff had regarding disclosure or dissemination of recorded telephone calls; whether the defendant was aware of the terms of any such policy; what portion of all the defendant's recorded telephone calls were provided to the State police and for what reason; or what procedure was

---

[10]The defendant does not challenge the constitutionality of the actual recording, as opposed to dissemination, of his telephone calls. See *Cacicio* v. *Secretary of Pub. Safety*, 422 Mass. 764, 773-774 (1996) (upholding validity of electronic telephone monitoring regulations promulgated by Department of Correction under art. 14 of Massachusetts Declaration of Rights).

followed by the State police or the district attorney's office to acquire them. The only relevant facts before us are the bare statement in the form signed by the defendant that recordings of telephone calls "may be used for any lawful purpose," and the investigating trooper's testimony that he retrieved four computer disks and listened to those calls. This evidence is not sufficient to demonstrate that in the circumstances, the defendant had a reasonable expectation of privacy in the recorded telephone calls, or that his related claim of fundamental unfairness has merit. We conclude that no substantial risk of a miscarriage of justice has been shown.

b. *Introduction of jail statement regarding sentencing.* The defendant argues that his statement to a friend — included in one of the recorded telephone calls introduced in evidence — that he would be pleased with a five-year sentence, constituted an offer to plead, and thus could not be argued by the prosecutor to show consciousness of guilt.[11] The defendant objected to the prosecutor's argument at trial.

"[S]tatements made in the course of plea negotiations are not admissible against an accused." *Commonwealth* v. *Wilson,* 430 Mass. 440, 442 (1999). However, statements made to someone who had no authority to negotiate a plea, and never led the defendant to think otherwise, are admissible. *Id.* at 443. *Commonwealth* v. *DoVale,* 57 Mass. App. Ct. 657, 663 (2003). Here, the defendant's statement to his friend in no way related to a plea negotiation, and was admissible. The prosecutor's characterization of the statement during his closing as an "offer[] to do five or eight or ten years" was perhaps an unfortunate choice of words, but the characterization itself did not convert what was clearly not an offer to plead guilty into such an offer. There was no error.

---

[11] In the recording, the defendant told his friend that he had heard that someone else had been sentenced to only eight to ten years in prison for felony-murder, which was "bringing [his] spirits up a little." At the friend's suggestion that the defendant might receive a sentence of five years, the defendant responded, "Dude, if I'm doing five, I'd be fucking — I'd be jumping for joy, I'd be doing fucking somersaults, splits and fucking cartwheels and everything." After paraphrasing the recording, the prosecutor invited the jury to "[a]sk yourself if an innocent man offers to do five or eight or ten years." See note 6, *supra*.

c. *Failure to record interviews.* The defendant challenges the judge's handling of Trooper Ryan's failure to record the February 11, 2003, interrogation of the defendant by the police. The defendant argues, first, that the jury instructions were insufficient.

At the close of the evidence, the judge instructed the jury regarding recording of statements as follows:

> "The Massachusetts Supreme [Judicial] Court has expressed a strong preference that such interrogations be recorded, whenever practical, on the theory that where there is a complete recording of the entire interrogation that produces the statement or confession, you, the jury, can evaluate its precise contents and any alleged coercive influences that may have been present.

> "Because of the absence of any recording of the interrogation, you should weigh the evidence of the defendant's statement with great caution and care. The absence of a recording permits you, but does not compel you to conclude that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt."

This instruction follows almost exactly the instruction mandated by this court in *Commonwealth* v. *DiGiambattista,* 442 Mass. 423, 447-448 (2004).[12] The judge was required to go no further.

Second, the defendant challenges the testimony relating to the failure to record the statement. At trial, the defense attorney on cross-examination established that the confession had not been recorded. Trooper Ryan, on redirect examination and over objection, then testified that the State police had no policy at the time to record statements, nor had it ever been his practice to do so. On recross-examination, the defense attorney was permitted to ask whether the policy had since changed (Ryan had no knowledge whether it had), and to ask Ryan to describe his understanding of this court's holding in the *DiGiambattista*

---

[12]To be precise, the judge's instruction goes slightly further than we require, adding the modifier "strong" and explanatory dicta from *Commonwealth* v. *DiGiambattista,* 442 Mass. 423, 446 (2004), that "[w]hen there is a complete recording of the entire interrogation that produced such a statement or confession, the fact finder can evaluate its precise contents and any alleged coercive influences that may have produced it."

case. However, the judge did not permit the defense attorney to ask whether Ryan knew about our cases, already published at the time of the interrogation, suggesting that interrogations should be recorded.

The defendant argues that the trooper's statement, to the effect that his failure to record the interview complied with then existing police procedure and his own practice, was irrelevant and prejudicial. The defendant further argues that, if the statement was admitted, it was error for the judge not to permit him to establish that the trooper knew of this court's preference for statements to be recorded at the time. We disagree.

"[A] trial judge has the discretion to control the scope of the examination of witnesses . . . and can exclude witnesses whose testimony is cumulative, repetitive, or confusing" (citation omitted). *Commonwealth* v. *Carroll*, 439 Mass. 547, 552-553 (2003). "[Q]uestions of relevancy 'are entrusted to the trial judge's discretion and will not be disturbed except for palpable error.' " *Commonwealth* v. *Wilson*, 427 Mass. 336, 349 (1998), quoting *Commonwealth* v *Azar*, 32 Mass. App. Ct. 290, 300 (1992). Here, Ryan's testimony concerning his own practice and State police policy or procedure in 2003 was relevant to rebut any suggestion of actual misconduct or special treatment, and the judge was within his discretion to allow it. Similarly, the judge could permissibly limit cross-examination on the trooper's knowledge of this court's jurisprudence. What the trooper knew or did not know about prior decisions of the court was only marginally relevant, and was potentially confusing to the jury. More importantly, the judge adequately addressed this court's views on the importance of recording police interrogations in his *DiGiambattista* instruction to the jury.

d. *Voluntariness of the defendant's statements.* The defendant argues that his Miranda waiver was invalid, and his subsequent confession to the homicide was involuntary, because he was experiencing a series of panic attacks during the February 11 interrogation. Accordingly, the argument goes, the defendant's motion to suppress should have been allowed.

To consider the defendant's claim, it is necessary to review

the motion judge's[13] decision denying the motion to suppress. In that decision, the judge found the following facts. On February 11, 2003, at approximately 3:20 P.M., the defendant agreed to be interviewed by Trooper Poirier and Trooper Ryan at the Leominster police station. The defendant was not threatened, coerced, or restrained, and was interviewed in an office rather than an interrogation room. He indicated orally and in writing that he understood his Miranda rights, and agreed to talk with the police. The judge found:

> "Trooper Ryan then proceeded with the interview, informing the defendant that he was the case officer. He also stated that the police had gathered more evidence, which contradicted the defendant's prior claim that he had never been in the victim's apartment. The defendant simply nodded his head. Trooper Ryan asked what happened. The defendant paused for a moment and did not reply. Trooper Ryan then asked the defendant: 'Was this a spur of the moment thing, or was it planned out?' The defendant replied: 'It was a spur of the moment thing.' "

The defendant then revealed the details of the murder over a conversational interview lasting approximately one-half hour. After the conversation, Trooper Ryan indicated that he would like to walk through the events again, while he transcribed a formal statement on his laptop computer, and the defendant agreed. The judge's findings continued:

> "At the start of the formal statement, Trooper Ryan asked the defendant whether he wished to call anyone. The defendant said he did not. Trooper Ryan also asked the defendant whether he was on any medication. The defendant stated that he was on medication for panic attacks. He stated that he did not have a panic attack on the day of the murder, but that he had been experiencing panic attacks since the murder. When asked whether he was on any alcohol or drugs, the defendant stated that he used to smoke pot, but now only drank beer. During the interview, the defendant was allowed to use the bathroom and was given water.

---

[13]The motion judge was the trial judge in this case.

"Trooper Ryan then set up his laptop computer and commenced the formal interview. He typed his questions, and then typed the defendant's answers. [He] provided the defendant with a print-out of the interview upon its completion. . . . The defendant took about ten to fifteen minutes to read the pages given to him. He initialed each page . . . . At 5:45 p.m., on the last page, he wrote his signature, the date, and the time. The formal interview lasted approximately one hour and fifteen minutes. Throughout the process, the defendant never invoked any of his *Miranda* rights.

"After [the defendant read and signed] his statement, Trooper Ryan notified the defendant that he was under arrest for murder. . . . Trooper Ryan again asked him whether he wanted to make a phone call. The defendant responded that he would wait until he found out the amount of his bail . . . . Throughout Trooper Ryan's dealings with the defendant on February 11, 2003, the defendant seemed calm and sober. His answers were responsive and he did not seem to be in physical discomfort."

Both the defendant and the Commonwealth presented expert witnesses on the issue of voluntariness at the motion hearing,[14] and each of the two experts testified specifically about the defendant's panic disorder and its relation to voluntariness. In his decision on the motion, the judge reviewed the testimony of the Commonwealth's expert, Dr. Malcolm Rogers, and the defense expert, Dr. John Daignault. The judge then concluded that the defendant did not suffer from a panic attack severe enough to impair his capacity voluntarily, knowingly, and intelligently to waive his Miranda rights and to speak with the police. The defendant challenges the judge's ultimate conclusion of voluntariness, as well as the judge's subsidiary findings that Trooper Ryan saw no symptoms of panic attacks, and that "one is not generally able to hide" those symptoms. The defendant's argument fails.

"When reviewing the denial of a motion to suppress, 'we accept the motion judge's subsidiary findings of fact absent clear

[14]The two expert witnesses also testified at trial.

error.' . . . 'The determination of the weight and credibility of the testimony is the function and responsibility of the judge who saw the witnesses . . . .' " *Commonwealth* v. *Maynard*, 436 Mass. 558, 569 (2002), quoting *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 321 (2001). The judge was entitled to credit Trooper Ryan's testimony that he saw none of the signs of panic attacks during the approximately two-hour interview,[15] and that the defendant never indicated physical discomfort or desire to leave. The judge was also entitled to credit Dr. Rogers's opinion testimony — which took into account Trooper Ryan's testimony about his observations of the defendant — and to find, based on Dr. Rogers's opinion, that "it would be highly unlikely that one could hide all . . . signs when experiencing an attack as intense as the defendant claims."[16] These findings in turn justified the judge's conclusion that the defendant did not suffer panic attacks so severe as to impair his ability to waive his Miranda rights and voluntarily to give statements.[17]

The defendant further argues in effect that the judge was required to find the defendant's statement to be involuntary as a matter of law, given the defendant's diagnosed panic disorder

[15]To be clear, Trooper Ryan did not testify that he saw no signs of panic attacks, and he was not asked this question or indeed anything directly about panic attacks. Rather, Ryan was asked whether the defendant mentioned, or whether Ryan observed, a series of specific conditions, such as whether the defendant complained of a pounding heart, nausea, or dizziness; and whether he appeared to be sweating, shaking, short of breath, dizzy, or suffering chills or hot flashes. Ryan answered each of these questions in the negative. Other evidence, presented by the expert witnesses, described these conditions as signs or symptoms of a panic attack.

[16]As the judge noted, the defense expert, Dr. Daignault, did not consider Trooper Ryan's observations of the defendant at the time of the interview in reaching his (Dr. Daignault's) conclusion that the defendant was suffering from a series of intense and debilitating panic attacks at that time.

[17]We note that the two experts understood their interviews with the defendant very differently. Based on his interview with the defendant, Dr. Rogers reported that the defendant felt anxiety during the police interview, related to "a mixture of paranoia and guilt" since the murder, but that "as soon as he had made the statement and 'gotten this off [his] chest' he felt some relief." Dr. Daignault reported that he learned from his interview that the defendant "was reportedly having panic attacks right from the beginning" and "confessed because he wanted to terminate the interrogation so the panic attacks would go away." Where the judge was presented with apparently conflicting factual reports, we are particularly loath to overturn his conclusion.

and inexperience with the criminal justice system, and the troopers' failure to record the interrogation. We conduct an independent review of the judge's application of the law. *Commonwealth v. Beland*, 436 Mass. 273, 279 (2002). "The Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant voluntarily, knowingly, and intelligently waived his Miranda rights in the totality of the circumstances" and "the same burden in proving the defendant's statements were made voluntarily." *Id.*

There is no per se rule against admitting statements of individuals with mental disorders, whether or not they have experience with the criminal justice system; rather, a statement is inadmissible as a matter of law only if it would not have been obtained but for the effects of the confessor's mental impairment. *Commonwealth v. Libran*, 405 Mass. 634, 639 (1989). *Commonwealth v. Vazquez*, 387 Mass. 96, 100 (1982). As for the absence of a recording, the failure to record a statement permits, but does not compel, a finding that the Commonwealth has failed to prove voluntariness beyond a reasonable doubt in the totality of the circumstances. *Commonwealth v. DiGiambattista*, 442 Mass. at 448.

In summary, the conclusion that the defendant waived his Miranda rights and confessed voluntarily is supported by the judge's subsidiary findings, including the lack of any evidence of threats or police misconduct; the noncoercive manner of the interrogation, including its location and tone; the defendant's calm, sober, and responsive demeanor; the defendant's detailed, coherent answers to questions; the lack of any manifestation of panic attacks, physical discomfort, or a desire to leave; and the fact that the defendant was advised of his rights and agreed to talk to the troopers. Set against these factually supported, specific findings, the factors to which the defendant points — his diagnosed panic disorder, his prior inexperience with the criminal justice system, and the failure of the police to record his statement — are not sufficient to raise a reasonable doubt as to the voluntary, knowing, and intelligent quality of his waiver of Miranda rights or confession. There was no error.

e. *Use of expert testimony regarding footprints.* The defendant argues that the judge should not have admitted expert evidence

regarding footprint identification. A State trooper who was qualified as an expert witness testified that a shoe print found at the scene was consistent with the defendant's shoes, and inconsistent with the victim's fiancé's shoes. The defendant objected at trial, and argues here that "[t]he correspondence between boots and footprints is a matter requiring no peculiar knowledge, and to which any person can testify." *Commonwealth* v. *Cortez*, 438 Mass. 123, 127 n.5 (2002), quoting *Commonwealth* v. *Sturtivant*, 117 Mass. 122, 133 (1875).

"The role of an expert witness is to help jurors interpret evidence that lies outside of common experience." *Commonwealth* v. *Wilson*, 441 Mass. 390, 401 (2004), quoting *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 581 (1998). However, "[a] trial judge has broad discretion with respect to the admission of expert testimony." *Commonwealth* v. *Cortez*, 438 Mass. at 127, quoting *Commonwealth* v. *Fryar*, 425 Mass. 237, 251, cert. denied, 522 U.S. 1033 (1997) (admitting expert testimony on footprint evidence). "In cases where expert testimony 'will be of assistance, it will be admissible, in the judge's discretion, even though the matter may be within the knowledge of the trier of fact.' " *Commonwealth* v. *Miranda*, 441 Mass. 783, 793 (2004), quoting P.J. Liacos, M.S. Brodin, & M. Avery, Massachusetts Evidence § 7.6.1, at 385 (7th ed. 1999).

The evidence concerning the footprint matches took the form of testimony provided by former Lieutenant Detective Brian O'Hara of the State police. As in *Commonwealth* v. *Cortez*, O'Hara "testified to significantly more than the correspondence between footwear and footprints left at the scene." *Id.* at 127 n.5. The subject of O'Hara's expert testimony was whether either of two pairs of shoes having almost identical soles — one pair belonging to the defendant and one pair belonging to the victim's fiancé — could have created a partial footprint. O'Hara testified as to how the footprint had likely been created and had been recovered, and how he created the sample prints from the known footwear. He identified inconspicuous details suggesting that the footprint was consistent with the defendant's shoes and inconsistent with the fiancé's — in particular, that the fiancé's shoes were not quite the same size when overlaid on the foot-

print found at the scene, and that the footprint had a design consistent with a small "L" inscribed on the defendant's shoes. O'Hara's preparation and analysis of evidence used to differentiate very similar shoes are subjects appropriate for expert testimony, and the judge committed no error.

3. *Review under G. L. c. 278, § 33E.* We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

4. *Conclusion.* The order denying the defendant's motion to suppress and the judgments of conviction are affirmed.

*So ordered.*