COMMONWEALTH *vs.* STEVEN J. KOUMARIS.

Plymouth. September 8, 2003. - November 20, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, & COWIN, JJ.

*Constitutional Law,* Admissions and confessions. *Practice, Criminal,* Admissions and confessions, Voir dire, Jury and jurors, Argument by prosecutor, Capital case. *Evidence,* Admissions and confessions. *Jury and Jurors. Witness,* Credibility.

At a hearing on a motion by a criminal defendant to suppress confessions he made to prison officials while in handcuffs, the judge did not err in admitting the defendant's confessions, where the undisputed facts made clear that the defendant was not subjected to either questioning or its functional equivalent but, rather, initiated the entire course of events; consequently, Miranda warnings were not necessary and, further, the defendant's subsequent confession to a police officer was not inadmissible as the fruit of the poisonous tree. [408-410]

This court, under its power pursuant to G. L. c. 278, § 33E, found no error in findings of the judge at a hearing on a motion to suppress confessions by a criminal defendant that the defendant's statements were not affected by his "mental illness." [410]

At a murder trial, the judge did not abuse his discretion in determining that comments by defense counsel that may have been overheard by jurors were innocuous and did not affect the case, and in declining to conduct a voir dire of the jury. [411-413]

At a murder trial, the prosecutor's statements during closing argument that were alleged to have constituted improper vouching for the veracity of a prosecution witness were not prejudicial error, where defense counsel had initially put the witness's credibility at issue, and the prosecutor merely defended the witness's credibility; where, from the context of the prosecutor's statements, the focus of the prosecutor's closing argument was on the witness's motive to lie; and where the judge's instructions properly informed the jury that closing arguments were not evidence and that they were to decide the facts based solely on the testimony and exhibits, and properly charged them regarding what they could consider in determining the credibility of the witnesses. [413-415]

INDICTMENT found and returned in the Superior Court Department on February 12, 1999.

A pretrial motion to suppress evidence was heard by *Richard J. Chin,* J., and the case was tried before him.

*Stephen Hrones* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. On January 9, 2002, the defendant, Steven J. Koumaris, was convicted of a 1975 felony-murder in the first degree with armed robbery as the predicate felony, G. L. c. 265, §§ 1 and 17, respectively.[1] The defendant appeals arguing that it was error for the Superior Court judge, who was also the trial judge, to deny his motion to suppress confessions he made to prison officials and police, and to refuse to conduct a voir dire of the jury regarding statements defense counsel made while jurors were nearby. He also argues that the prosecutor vouched for the veracity of a Commonwealth witness in closing argument, thereby committing reversible error. We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E. We reject the defendant's claims of errors and find that the prosecutor's argument, taken in context, was not reversible error. We also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E. Accordingly, we affirm the defendant's conviction.

1. *Facts.* We recite facts the jury could have found, in the light most favorable to the Commonwealth, reserving certain facts for our discussion of other issues. *Commonwealth* v. *Vinnie,* 428 Mass. 161, 164, cert. denied, 525 U.S. 1007 (1998).

On June 12, 1975, the victim, a twenty year old woman, was the attendant working at a Hess gasoline station in Brockton. It was Hess's policy that attendants were to keep approximately fifty dollars on their person to make change for customers, with any excess to be deposited in a floor safe.

At approximately 3:30 P.M., a witness saw a man with red hair near a public telephone inside the station. The victim also was inside the station. Sometime before 4 P.M., in the general vicinity of the station, another witness saw a man with reddish brown hair, who had bright red blood on the front of his trousers, running behind a New England Telephone building through its parking lot in the direction of a junk yard. Nearby was a stream with a bridge over it.

---

[1]The armed robbery charge was placed on file due to sentencing on the felony-murder charge.

The victim's body was discovered by a gasoline station patron at approximately 4 P.M. The victim suffered eighteen stab wounds, several of which were characterized as defensive wounds.

The defendant confessed to the murder four times. The first confession took place in 1976. The defendant, whose hair was light red at the time, was incarcerated in the Plymouth County house of correction. He confessed to Herbert Knight, a fellow inmate who had befriended him.[2] The second and third confessions took place on March 8, 1998, when the defendant was incarcerated for offenses unrelated to the murder in a segregation unit at the Southeastern Correctional Center. He confessed separately to two correction officers, Jeffrey Souza and Russell Curran. The defendant's fourth confession was to State Trooper Paul Petrino and Brockton Detective Emanuel Gomes, who were assigned to investigate the confessions the defendant made to the correction officers. This last confession occurred after the defendant had received his Miranda rights and signed a waiver form.

Each confession was essentially the same. The defendant stated that he committed a murder in Brockton. He stated that, in 1975 or 1976, at approximately 10 A.M., he stabbed a female Hess gasoline station attendant numerous times with a kitchen knife. He said the attendant was approximately twenty-four years old and had long brown hair. The defendant said that he was "high on drugs" and went to the gasoline station in his mother's 1965 Chevrolet station wagon because he needed money for drugs. The defendant stated that he had to wait for a man who was in the station to leave and then went up to the attendant and demanded money. The victim said, "No," and she screamed and struggled with the defendant; she also slapped him. He took a knife out and stabbed her. The victim fell to the floor and the defendant continued to stab her until she stopped struggling and screaming. The defendant then reached into the victim's front pocket and removed approximately fifty dollars.

The defendant said he threw the knife away. He told the inmate that he threw it "into a river or a lake or something,"

---

[2] As discussed, *infra*, Knight reported this information to authorities in 1976, with no apparent consequences for the defendant.

but told the police and correction officers that he threw it into a junk yard. While being questioned by the State trooper and Brockton detective, the defendant pointed to a photograph of the victim and began .to cry. The defendant accurately told one of the correction officers that two detectives investigating the case were named Gentile and Reardan, and said to the State trooper that he could not be certain it happened at 10 A.M.

As a result of his confession to the State trooper and Brockton detective, the defendant was indicted for murder in the first degree and armed robbery.

2. *Denial of the defendant's motion to suppress.* The defendant argues that it was error for the judge to deny his motion to suppress the confessions to the murder because, he claims, he was subject to a "custodial interrogation" when he confessed to correction officers, and the officers did not read him the Miranda warnings. The defendant also argues that his subsequent confession to Trooper Petrino was inadmissible because it was the fruit of the poisonous tree. See *Commonwealth* v. *Brandwein,* 435 Mass. 623, 628 (2002); *Commonwealth* v. *White (No. 3),* 365 Mass. 312, 314 (1974), cert. denied, 419 U.S. 1111 (1975).

We present the facts as found by the motion judge and add, as necessary, uncontested facts from the record of the motion hearing. *Commonwealth* v. *Leon L.,* 52 Mass. App. Ct. 823, 824 (2001). "[W]e accept the motion judge's subsidiary findings of fact absent clear error." *Commonwealth* v. *Yesilciman,* 406 Mass. 736, 743 (1990). The motion judge's legal conclusion is a matter for review, especially if constitutional issues are involved. *Commonwealth* v. *Perry,* 432 Mass. 214, 234 (2000). A judge's ruling may be reversed if the facts are clearly erroneous or if justice requires. *Commonwealth* v. *Moon,* 380 Mass. 751, 756 (1980).

As noted, on March 8, 1998, the defendant was incarcerated in a segregation unit. At approximately 6 P.M., he asked Officer Souza if he could speak to an "inner perimeter security" (IPS) officer.[3] When Souza told the defendant that no IPS officer was available, the defendant said that he wanted to speak to Souza

---

[3] "Inner perimeter security" investigates internal complaints within the prison.

because he wanted to get something off his conscience. He also stated that he believed he was going to die imminently.

Following prison procedure, Souza handcuffed the defendant and took him to an interview room. The defendant confessed to the murder and signed Souza's written notes.[4] After the defendant signed the notes, Souza contacted the IPS officer, Russell Curran. The defendant, again handcuffed, went with Officer Curran to an interview room, and reiterated his confession to the murder. Both correction officers stated that the defendant was calm and spoke clearly. Further, Curran knew the defendant because Curran regularly searched prisoners who, like the defendant, worked in an "Industries" unit at the prison.

Relying on *Commonwealth* v. *Larkin*, 429 Mass. 426, 434 (1999), the defendant argues that because he was in handcuffs "throughout the entire questioning" by correction officers, which limited his "ability to leave the interview room," he was subject to custodial interrogation for Miranda purposes. The defendant's argument fails because, unlike the defendant in *Larkin*, the undisputed facts make clear that, in this case, the defendant was never interrogated by the correction officers. To the contrary, the defendant was not subjected to "either express questioning or its functional equivalent." *Commonwealth* v. *Painten*, 429 Mass. 536, 541 (1999), quoting *Commonwealth* v. *Torres*, 424 Mass. 792, 796-797 (1997). The defendant initiated the entire course of events. It was only in response to his insistence that he talk to an officer that evening that Souza responded, "Go ahead. Tell me what you got to say."[5] The defendant then proceeded to do what he had told Souza he wanted to do — get something off his conscience. Only after the defendant had confessed, did Souza ask one question (regarding the whereabouts of the knife).

In the subsequent meeting with Officer Curran, Curran also began by asking the defendant what he wanted to say, and

---

[4]At trial, Souza testified that he removed the handcuffs so the defendant could sign the notes.

[5]The motion judge mischaracterized this as a question, stating, "Souza asked [the defendant] what he wanted to say." The transcript makes clear that Souza, rather than asking a question, made a declarative statement, and the defendant did not challenge Souza's statement. In his brief, the defendant also presents this statement in the declarative, not the interrogative.

asked *no* questions. The defendant later told Trooper Petrino that there was no coercion by Souza. These interactions between the defendant and the correction officers do not amount to an interrogation.

Because the defendant was not subject to an interrogation by correction officers, Miranda warnings were not necessary.[6] Moreover, it follows for the same reason that the defendant's subsequent confession to Trooper Petrino was not inadmissible as the fruit of the poisonous tree. See *Commonwealth* v. *Brandwein*, 435 Mass. 623, 628 (2002); *Commonwealth* v. *White (No. 3)*, 365 Mass. 312, 314 (1974).

In addition, although it is not raised as an issue on appeal, under our power pursuant to G. L. c. 278, § 33E, we find no error in the judge's findings that the defendant's statements were not affected by his "mental illness."[7]

The judge did not err in admitting the defendant's confessions.

---

[6]Because of our ruling, the issue of custody need not be addressed other than to note that where the defendant, already incarcerated in a segregation unit, was handcuffed and taken, in the presence of a single officer, to an interview room to have a conversation the defendant requested, such routine use of handcuffs did not operate to create a "custodial" setting "beyond that imposed by the confines of ordinary prison life." *Commonwealth* v. *Larkin*, 429 Mass. 426, 435 (1999), quoting *People* v. *Margolies*, 125 Misc. 2d 1033, 1041 (N.Y. Sup. Ct. 1984).

[7]At the suppression hearing, the defendant raised the possibility that he may have been suffering from mental illness at the time of his confession. The motion judge made the following findings, which we conclude are not clearly erroneous. The defendant introduced no expert or expert opinion in support of his claim, but the judge was given, for review, the defendant's Department of Correction medical and mental health records for March, 1998. The judge found that "despite [the defendant's] questionable mental stability on the day before the confession and before receiving medications, there is no evidence that his mental condition affected his cognitive abilities such that his statements should be suppressed." The judge found that the defendant was interviewed by an evaluator on the day before the confession, and denied that he was having either "auditory or visual hallucinations," or that he was "suicidal." The evaluator noted that the defendant was "oriented in all spheres" and that the defendant stated that his behavior (including "banging his head") "was a consequence of his being a 'Born again Christian.' " The defendant started receiving medication the day after the confession. The judge found, "Even after being on medication for several days, [the] defendant never recanted his confession."

In addition, the only two defense witnesses testified that in November, 1999, the defendant apologized for murdering their daughters, which was not

3. *Voir dire of the jury.* The defendant claims that the judge erred when he refused to conduct a voir dire of the jury to determine whether they heard, and were affected by, comments of defense counsel they may have overheard. The defendant argues that the failure to conduct a voir dire of the jury denied him his constitutional right to a trial by an impartial jury under the Sixth Amendment to the United States Constitution. In analyzing this issue, we provide the relevant facts.

On the first day of trial, the Commonwealth presented the testimony of four witnesses: the victim's brother, the witness who discovered the victim's body at the Hess gasoline station, an ambulance attendant who performed CPR on the victim, and the witness who saw a man with red hair in the station, by the public telephone. At the conclusion of their testimony, the judge called a recess. On the way out of the court room, defense counsel was talking to another attorney. Unaware that the jurors were right behind her, defense counsel said that she did not have much with which to cross-examine the witnesses. The other attorney's response was that defense counsel was "making [her] points."

On returning from the recess, defense counsel told the judge what happened and asked the judge to conduct a voir dire of the jury. The judge declined and said that the comment was innocuous.[8]

If "a judge determines that the jury may have been

___

true. The jury were warranted in discounting these admissions, especially as they occurred after his confession to the victim's murder.

[8]The exact exchange was as follows:

> THE CLERK: "[Defense counsel], you have a matter to bring to the Court's attention, ma'am?"

> DEFENSE COUNSEL: "Yes, Judge, as I was breaking just after — just after we broke for lunch, I was leaving the courthouse with [another attorney] who was in back of me, and on the way out, I was talking to her, unfortunately, about the case without being aware that there were jurors coming out right behind me, and I don't know if they overheard anything or not. I do remember that at one point I said to her, and I think it's maybe all I said about the case, that I didn't have much to cross-examine and her response was that I was making my points, and although I did not see the juror, specifically, she felt that one of the jurors at least overheard what we had said, because at that point she

exposed . . . to material that 'goes beyond the record and raises a serious question of possible prejudice,' he should conduct a voir dire of jurors to ascertain the extent of their exposure to the . . . material and to assess its prejudicial effect." *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000), quoting *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). "The determination of potential juror prejudice is a matter within the sound discretion of the trial judge." *Commonwealth* v. *Federici*, 427 Mass. 740, 747 (1998), citing *Commonwealth* v. *Samuel*, 398 Mass. 93, 96 (1986), and G. L. c. 234, §§ 26B, 28.

Defense counsel's remark came after only thirty-five minutes of testimony. Defense counsel did not know if any juror actually overheard the comments. The testimony of three of the four Commonwealth's witnesses established preliminaries regarding the time the victim was found, her condition, and the Hess gasoline station's policy regarding attendants' keeping approximately fifty dollars on their person. The fourth witness testified that the attendant and a man with red hair were in the station at approximately 3:30 P.M. On cross-examination, defense counsel elicited that the fourth witness was never able to establish the identity of the man he saw that day.

Given these facts (and the multiple confessions of the defendant), the testimony of these witnesses were not key to the

---

had turned around and saw that they were walking by us."

THE JUDGE: "Sounds like an innocuous statement."

DEFENSE COUNSEL: "It may very well have been, Your Honor. It certainly was not intended to be overheard by the jurors, however, and I don't know whether it would have any effect on them, but I think it has to be put on record, and I leave it to the Court to decide . . . ."

THE JUDGE: "If you didn't discuss anything other than that . . . ?"

DEFENSE COUNSEL: "I don't remember saying anything more than that about the case itself. I think an inquiry should be made to the jurors."

THE JUDGE: "Yeah, but, I mean, if they did, I don't think it affects this case. Mr. [Prosecutor]."

THE PROSECUTOR: "I don't think it's got any bearing to be truthful. I don't think any inquiry is necessary."

THE JUDGE: "[L]et's bring the jury in."

outcome of the trial. Furthermore, the response from the other attorney was favorable to the defendant. We cannot say, therefore, that the judge abused his discretion in determining that defense counsel's statement was "innocuous" and did not affect the case, and in declining to conduct a voir dire of the jury.

4. *The prosecutor's closing statement.* The defendant argues that the prosecutor committed reversible error by improperly vouching for the veracity of a prosecution witness during closing argument.

At the defendant's trial, the prosecution called Herbert Knight, the inmate to whom the defendant confessed in 1976. Knight, who was "on the run from charges in Michigan" at that time, took the information to Massachusetts authorities in hopes of receiving favorable consideration in Michigan. Although at the defendant's trial, Knight claimed that he never received anything for the information, in cross-examination, defense counsel implied that Knight had a motive to lie because of his attempt to obtain consideration in his own case. In her closing, defense counsel suggested that Knight either fabricated the story or that he took advantage of the defendant and convinced him that he had killed the victim.

In his closing, the prosecutor made statements addressing Knight's testimony:

> "Let's first analyze the statements of Herbert Knight in 1976, something he tells his friend. Well, he's a con. That's what he is, in jail looking for somebody that he can rat out on, and [the defendant] makes the mistake of talking to him and telling him what happened, and Herb Knight goes to the authorities and, of course, is his credibility in doubt? Sure it is. He's looking for a deal.

> "But that was in 1976. We're talking about him on the stand in 2002. He no longer is looking for a deal. This is a man that's done his time. He's living in Ware, Massachusetts. He's sixty-two years old and he gets a phone call from Trooper Petrino. What do you know about this?

> This is a guy who will tell you that he wasn't treated

right. He has motive not to tell what he knows to help law enforcement, but I suggest to you that he did what was right. *He told you the truth. There's credibility to what he said on that stand.* What he told the police in 1976, you may question because of his motive to lie." (Emphasis added.)

Defense counsel objected to the argument as improper vouching for Knight's credibility. The judge stated that the argument concerned Knight's motive to lie and, in substance, overruled the objection. We examine the defendant's claim for prejudicial error. *Commonwealth* v. *Pearce*, 427 Mass. 642, 644 (1998).

It is never proper for an attorney to vouch for a witness's credibility. *Commonwealth* v. *Chavis*, 415 Mass. 703, 713 (1993), and cases cited. See *Commonwealth* v. *Ciampa*, 406 Mass. 257, 265 (1989). However, it is permissible to comment and draw inferences regarding the evidence at trial, *Commonwealth* v. *Chavis*, *supra*, and cases cited, or to point to the logical reasons a witness's testimony should be believed, *Commonwealth* v. *Rolon*, 438 Mass. 808, 816 (2003). Here defense counsel put Knight's credibility at issue during both her cross-examination of him and her closing argument. As discussed, she argued that Knight had either fabricated the story or convinced the allegedly weak-minded defendant that he had committed the crime. Therefore, "the prosecutor legitimately could defend the credibility" of Knight. *Commonwealth* v. *Chavis*, 415 Mass. 703, 714 (1995). See *id.* at 713 ("prosecutor may make a fair response to an attack on the credibility of a government witness"). Moreover, "[c]losing arguments must be viewed 'in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial.' " *Commonwealth* v. *Allison*, 434 Mass. 670, 687 (2001), quoting *Commonwealth* v. *Viriyahiranpaiboon*, 412 Mass. 224, 231 (1992). Cf. *Commonwealth* v. *Raymond*, 424 Mass. 382, 391-392 (1997).

Taken in context, the prosecutor's statements, "He told you the truth. There's credibility to what he said on that stand," were not improper vouching. It is clear from the context that the prosecutor's argument was focused on Knight's motive to lie. *Commonwealth* v. *Marangiello*, 410 Mass. 452, 465 (1991),

quoting *Commonwealth* v. *Stone*, 366 Mass. 506, 516 (1974) (prosecutor's statement in support of witnesses' credibility appropriately "based on the demeanor and motive of the witnesses and the consistency of their stories"). See *Commonwealth* v. *Hardy*, 431 Mass. 387, 396 n.6 (2000) ("He's telling you the truth" not improper vouching).

Moreover, the judge informed the jury that closing arguments were not evidence, told them repeatedly that they were to decide the facts based solely on the testimony and the exhibits,[9] and charged the jury regarding what they could consider in determining the credibility of the witnesses. See *Commonwealth* v. *Pearce, supra* at 645, and cases cited. Cf. *Commonwealth* v. *Raymond, supra* at 392 (no objection from defense counsel). Taken in context together with the judge's instructions to the jury, we find that the prosecutor's statements were not prejudicial error.

5. *Conclusion.* For the reasons stated, we find no merit to any of the issues raised on appeal by the defendant, and decline to exercise our power under G. L. c. 278, § 33E.

*Judgment affirmed.*

---

[9]The prosecutor also reminded the jury that they were the fact finders. See generally *Commonwealth* v. *Curtiss*, 424 Mass. 78, 83 (1997).