SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. JASON ESTABROOK

 
 Docket:
 SJC-13442
 
 
 Dates:
 May 9, 2025 August 25, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Wendlandt, Georges, Dewar, & Wolohojian, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Homicide. Felony-Murder Rule. Armed Home Invasion. Practice, Criminal, Motion to suppress, Admissions and confessions, Voluntariness of statement, Waiver, Instructions to jury, Capital case. Constitutional Law, Admissions and confessions, Voluntariness of statement, Waiver of constitutional rights. Evidence, Admissions and confessions, Voluntariness of statement. Waiver.
 
 

             Indictments found and returned in the Superior Court Department on December 3, 2012.
            A pretrial motion to suppress evidence was heard by Kathe M. Tuttman, J., and the cases were tried before Edward P. Leibensperger, J.
            Andrew S. Crouch for the defendant.
            Jamie Michael Charles, Assistant District Attorney (David Marc Solet, Assistant District Attorney, also present) for the Commonwealth.
            GEORGES, J.  In the summer of 2012, Quintin Koehler (victim) was fatally shot in his Billerica home during a botched robbery carried out by multiple perpetrators.  The defendant, Jason Estabrook, was implicated by his cousin during a recorded police interview.  The defendant initially gave police an alibi for the time of the murder, but later changed his story after being shown a portion of his cousin's recorded interview.  The defendant then proceeded to make a series of incriminating statements, including admitting his role in the crimes.  Charged with murder in the first degree and other related offenses, the defendant moved to suppress his statements, arguing essentially that they were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966), and made involuntarily.  The motion was denied, and he was convicted by a jury of felony-murder in the first degree and armed home invasion.
            On appeal, the defendant challenges the denial of his motion to suppress and the jury instruction on armed home invasion, and seeks relief under G. L. c. 278, § 33E (§ 33E).  Finding no reversible error or basis for relief, we affirm the defendant's convictions.
            Background.  1.  Underlying crimes.  We begin with a summary of the evidence that the jury could have found, reserving a fuller account of the facts for our analysis of the defendant's claims.
            In the early morning hours of July 7, 2012, the defendant, his cousin Adam Bradley, and four other men traveled to a residence in Billerica.  Several of the men -- armed with handguns -- forced their way into the home's kitchen, intending to rob the occupants of money.  Upon hearing a "series of bangs," the victim and his brother entered the kitchen, and a struggle ensued.  Attempting to repel the intruders, the brothers confronted the armed men.  The victim struck the defendant with a tea kettle, and during the effort to push the defendant out of the home, the victim was shot and killed.  The perpetrators fled the scene without taking any money.  Later, the defendant was admitted to the emergency room of a medical center in Salem for shoulder and back pain due to being struck on the head with a tea kettle.
            2.  Motion to suppress.  We summarize the facts as found by the motion judge after an evidentiary hearing, supplemented by undisputed evidence.  See Commonwealth v. Delossantos, 492 Mass. 242, 244 (2023).  Further factual detail is provided as relevant to our analysis below.
            In August 2012, investigators identified the defendant as a potential suspect after interviewing Bradley, who described the defendant as someone who "likes to rob."  On August 8, 2012, Billerica police Detective Roy Frost and a State police trooper interviewed the defendant at the Lynn police station, where he was being held on an unrelated matter.  After advising him of his Miranda rights, the officers told the defendant they were investigating a home invasion in Billerica that had resulted in a homicide, and that his name "[kept] coming up."  The defendant -- who voluntarily agreed to the interview and confirmed he understood his rights -- denied any involvement, stating that he had been home and had not been with Bradley that evening.  After approximately forty minutes, the defendant invoked his right to counsel, and the interview ended.
            The following week, now out of custody, the defendant again agreed to speak with Frost at the district attorney's office.  He indicated that he had consulted with counsel and was open to cooperating.  During that forty-five minute interview, the defendant again provided an alibi.
            On September 26, 2012, at 5:21 P.M., the defendant was arrested and later transported to the Billerica police station.  He was informed that he was being charged with murder, home invasion, and armed robbery in connection with the July 7 incident.  During booking, the defendant appeared lethargic, slurred his speech, and was unsteady on his feet.  The booking officer, suspecting intoxication, asked the defendant about his substance use.  The defendant admitted that he had taken two Klonopin tablets without a prescription and requested to call his attorney.  The officer assured him that he could do so once booking was complete.  When the defendant asked whether "somebody turned [S]tate," the booking officer responded that he could not answer any questions.
            In response to routine booking questions, the defendant disclosed a history of mental health treatment, including for depression and a nervous condition, as well as a prior suicide attempt.  He denied having current suicidal thoughts.  After leaving a voicemail message for his attorney, the defendant was advised of his Miranda rights, which he indicated he understood.  Although the defendant expressed a desire to speak with police, the booking officer declined because the defendant was represented by counsel and had admitted to taking Klonopin.  The defendant was placed in a holding cell for the night.  On his way to the cell, the defendant spontaneously stated, "No matter what [Bradley] said, I didn't do anything."
            The next morning on September 27, the defendant appeared sober.[1]  While being fingerprinted by Frost, the defendant asked if he could smoke.  Because smoking was prohibited in the station, Frost brought the defendant to the sally port.[2]  There, the two engaged in casual conversation.  Frost did not question the defendant, but the defendant initiated a conversation, asking whether Bradley had been arrested.  Frost responded that he had not but had been interviewed several times.  When the defendant asked if Bradley "went [S]tate" -- meaning cooperated with the police -- Frost explained that he could not discuss the matter further unless Miranda warnings were provided.
            The defendant pressed the issue, expressing disbelief that his cousin had cooperated.  When Frost informed the defendant that Bradley's interview had been recorded, the defendant asked to view it.  Frost informed the defendant that any further discussion or viewing of the video recording could only occur after the defendant properly waived his rights.  Frost, another detective, and the defendant then moved to a conference room, where Frost reminded the defendant of his pending charges and earlier attempt to contact his counsel.  Frost readministered Miranda warnings to the defendant, who then signed a Miranda rights waiver and recording permission form.  Frost also advised the defendant of his Rosario rights and handed the defendant a Rosario waiver form,[3] which the defendant also signed.  The defendant affirmed that he was not under the influence of any substance.
            The officers played a brief excerpt of Bradley's interview, in which Bradley called the defendant a "crazy animal who likes to rob people" and implicated him in the Billerica shooting.  After viewing the excerpt, the defendant indicated his willingness to speak but requested the presence of an assistant district attorney, stating, "There[ are] no deals without a[n] [assistant district attorney]."  While a detective unsuccessfully attempted to reach the prosecutor, the defendant made several unsolicited statements, including, "I'll tell you one thing, it was all his idea. . . .  All I was supposed to do was push in the door. . . .  I didn't know what was going to happen inside the house."  The defendant went on to describe additional details of the armed home invasion.
            3.  Procedural history.  In December 2012, a grand jury returned indictments against the defendant for murder in the first degree, in violation of G. L. c. 265, § 1; armed home invasion, G. L. c. 265, § 18C; attempted armed robbery, G. L. c. 274, § 6; unlawful possession of a firearm, G. L. c. 269, § 10 (a); and unlawful possession of ammunition, G. L. c. 269, § 10 (h).  Prior to trial, the defendant moved to suppress statements he made to police on September 27, 2012, asserting that they were obtained in violation of his Miranda rights and made involuntarily.  Following an evidentiary hearing, the motion judge denied the motion.[4]
            Trial commenced in June 2016 before a different Superior Court judge.  The day before jury empanelment, the Commonwealth entered a nolle prosequi as to the charges of unlawful possession of a firearm and unlawful possession of ammunition.  The jury convicted the defendant of murder in the first degree on a theory of felony-murder, with attempted armed robbery and armed home invasion serving as the predicate felonies.  The jury also returned guilty verdicts on the charges of armed home invasion and attempted armed robbery.  The trial judge sentenced the defendant to life in State prison without the possibility of parole on the murder conviction, and to a concurrent term of not less than twenty years nor more than twenty-five years for the armed home invasion.  The attempted armed robbery conviction was dismissed as duplicative.[5]
            The defendant timely appealed in June 2016, and the appeal entered in this court in May 2023.
            Discussion.  On appeal, the defendant principally challenges the denial of his motion to suppress statements made to law enforcement.  He first contends that the conversation in the sally port constituted a custodial interrogation, and that the absence of Miranda warnings rendered all subsequent statements inadmissible.  Alternatively, he argues that even if Miranda warnings were not yet required, his subsequent waiver of rights and ensuing statements were not voluntary.
            The defendant also claims error in the trial judge's instructions to the jury on the armed home invasion charge.  Finally, the defendant urges this court to grant relief under G. L. c. 278, § 33E, citing his limited role in the crimes, his medical and psychological history, and the comparatively lesser sentences imposed on his coventurers.  We consider each argument in turn.
            1.  Motion to suppress.  In reviewing the denial of a motion to suppress concerning the waiver of Miranda rights and the voluntariness of a defendant's statements, "we accept the judge's subsidiary findings of fact absent clear error, give substantial deference to the judge's ultimate findings and conclusions of law, but independently review the correctness of the judge's application of constitutional principles to the facts found" (citation omitted).  Commonwealth v. Escobar, 493 Mass. 694, 700 (2024).
            a.  Custodial interrogation.  The defendant first argues that his conversation with Frost in the sally port constituted a custodial interrogation, thereby requiring Miranda warnings.  The defendant contends that Frost did more than simply respond to his questions -- that Frost made "provocative statements" designed to entice the defendant into making incriminating remarks, particularly by referencing the prospect of learning what the defendant's cousin, Bradley, had said about him.  On this basis, he asserts his later statements, made after Miranda warnings were administered in the conference room, were tainted by the earlier, unwarned conversation.
            It is well established that Miranda warnings are required when a suspect is subjected to custodial interrogation.  Commonwealth v. Weidman, 485 Mass. 679, 684 (2020).  An interrogation includes not only express questioning but also its "functional equivalent" -- that is, "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response" (citation omitted).  Commonwealth v. Gonzalez, 465 Mass. 672, 675 (2013).  The standard is objective:  the question is whether a reasonable person would perceive the officer's conduct as an interrogation.  Id. at 675-676.
            Because Frost did not expressly question the defendant in the sally port, the relevant inquiry is whether his conduct constituted the functional equivalent of interrogation.[6]  The motion judge determined that it did not, and we discern no error in that conclusion.[7]
            As the motion judge found, it was the defendant -- not Frost -- who initiated the exchange by asking whether Bradley had been arrested.  See Commonwealth v. Koumaris, 440 Mass. 405, 409 (2003) ("The defendant initiated the entire course of events"); Commonwealth v. Diaz, 422 Mass. 269, 271 (1996) (defendant's "first statement was spontaneous and unprovoked").  In response, Frost truthfully stated that Bradley had not been charged but had been interviewed -- which was an informational reply, not an inquiry.  See Koumaris, supra at 409-410; Commonwealth v. Duguay, 430 Mass. 397, 401 (1999) (no interrogation where officer merely answered defendant's questions).[8]
            When the defendant asked whether Bradley had "turned [S]tate," Frost declined to answer, explaining that he could not discuss the matter unless the defendant first received Miranda warnings and waived his right to counsel.  See Gonzalez, 465 Mass. at 676 (officer's repeated indication that "now was not the time to talk" precluded finding of interrogation).  It was only after the defendant continued referencing Bradley's possible cooperation that Frost disclosed the existence of a video recording of Bradley's interview -- without revealing its contents.  Although the defendant had not explicitly asked whether the interview had been recorded, Frost's response was not the kind of "prodding designed to elicit" an incriminating response.  Commonwealth v. Chipman, 418 Mass. 262, 273 (1994).  Rather, Frost disclosed a single piece of factual information in response to the defendant's continued attempts to solicit details.  See United States v. Conley, 156 F.3d 78, 83 (1st Cir. 1998).
            Moreover, when the defendant asked to view the video recording, Frost indicated that Miranda warnings would first be required.  See Duguay, 430 Mass. at 401.  The interaction, viewed in its entirety, reflects Frost's consistent effort to avoid improper questioning and to limit the exchange to the defendant's own initiative.
            The defendant nonetheless contends that Frost's subjective intent to elicit an incriminating response[9] is apparent from the motion judge's observation that Frost likely hoped to confront the defendant with Bradley's statements.  While an officer's intent is not wholly irrelevant to the inquiry, it is not dispositive.  Commonwealth v. Torres, 424 Mass. 792, 798 (1997).  Commonwealth v. Brant, 380 Mass. 876, 883, cert. denied, 449 U.S. 1004 (1980).  Rather, the officer's subjective intent is one factor in assessing whether the police should have known that their words or actions -- particularly those designed to provoke an incriminating response -- would likely be perceived as interrogation by the suspect.  Torres, supra.  See Gonzalez, 465 Mass. at 675-676.
            The judge's finding that Frost may have intended to confront the defendant with the Bradley interview -- something Frost did only after a valid Miranda waiver -- does not establish that Frost sought or expected to elicit a statement during the sally port exchange.  See Torres, 424 Mass. at 798 (no functional equivalent of interrogation where police merely aware of possibility suspect may make incriminating statement).  Cf. Brant, 380 Mass. at 883 (motion judge found authorities "hoped and expected" defendant would make statement).
            The defendant also suggests that Frost took advantage of the defendant's vulnerable mental and physical state, citing the officer's awareness of the defendant's intoxication the night before.  But the record supports the motion judge's finding that by the morning of the sally port interaction, the defendant was no longer under the influence.  There is no evidence that Frost knew the defendant was unusually susceptible at the time.  See Rhode Island v. Innis, 446 U.S. 291, 302-303 (1980) (considering police's knowledge of defendant's peculiar susceptibility in functional equivalent of questioning analysis).
            Moreover, although Frost may have known that the defendant suspected that Bradley had implicated him, such knowledge, without more, does not transform the interaction into the functional equivalent of a custodial interrogation.  See Torres, 424 Mass. at 797-798.  At most, Frost's acknowledgment of the video recording and his willingness to show it to the defendant -- after proper Miranda warnings -- constituted subtle encouragement, not conduct that an officer should have known would be reasonably likely to prompt an incriminating response.  See Innis, 446 U.S. at 303 (error to equate "subtle compulsion" with interrogation); Gonzalez, 465 Mass. at 676 (reasonable person in defendant's circumstances would not have understood officer's statement -- that it was "not the time to talk" -- as attempt to elicit incriminating response).
            Accordingly, the motion judge properly concluded that the sally port exchange did not constitute the functional equivalent of an interrogation.
            b.  Voluntariness of Miranda waiver and statements.  The defendant next contends that, even if the sally port exchange did not violate his constitutional rights, his subsequent Miranda waiver and postwaiver statements in the conference room were not voluntary.  We again find no error in the motion judge's conclusion to the contrary.
            We begin with the validity of the Miranda waiver.  See Commonwealth v. Morales, 461 Mass. 765, 776 (2012) ("Due process requires a separate inquiry into the voluntariness of [a defendant's statement] apart from the validity of the Miranda waiver" [citation omitted]).  Where the Commonwealth seeks to admit statements following a purported waiver, it bears the "particularly heavy" burden of proving beyond a reasonable doubt that the waiver was knowing, intelligent, and voluntary.  Commonwealth v. Tremblay, 480 Mass. 645, 655-656 (2018).
            The voluntariness of a waiver is assessed under the totality of the circumstances, including such factors as promises or inducements; the defendant's conduct, age, education, intelligence, emotional stability, prior experience with the criminal justice system, and physical and mental condition; whether the defendant or the police initiated discussion of any deal or leniency; and the details of the interrogation, including the recitation of Miranda warnings.  Commonwealth v. Gallett, 481 Mass. 662, 668 (2019).  Commonwealth v. Melo, 472 Mass. 278, 293 (2015).  Here, the motion judge found -- and the record supports -- that the defendant, who stated that he was not under the influence of any substance and appeared calm and coherent, was sober at the time of the waiver.  See Commonwealth v. Boyarsky, 452 Mass. 700, 715 (2008).  The defendant could read, write, and understand English; had completed high school; and had taken some college courses.  See Commonwealth v. Raposa, 440 Mass. 684, 688 (2004); Commonwealth v. Scoggins, 439 Mass. 571, 575-576 (2003).
            Although the defendant had a history of mental health issues, including depression, psychiatric hospitalization, and a past suicide attempt, those circumstances alone do not render his waiver involuntary.  See Commonwealth v. Hilton, 443 Mass. 597, 606 (2005), S.C., 450 Mass. 173 (2007).  The relevant inquiry is whether the waiver would not have been obtained but for the mental impairment.  Boyarsky, 452 Mass. at 715.  Here, there was no such evidence:  the defendant denied suicidal ideation, demonstrated coherent reasoning, and made no mention of emotional distress during the interview.  See id.
            The detectives also reminded the defendant that he had not yet spoken with his attorney, whom he had attempted to call the night before, and made clear the seriousness of the charges.  Despite this, the defendant neither reasserted his right to counsel nor declined to speak.  Instead, after being read his Miranda rights, he signed a waiver and agreed to speak with the detectives.
            Further, while the prospect of negotiating a deal with an assistant district attorney was raised, it was the defendant himself -- not the officers -- who pressed this issue.  In response, the officers provided no assurances of a deal, further supporting the voluntariness of the defendant's decision to engage with law enforcement.  See Commonwealth v. Mandile, 397 Mass. 410, 414 (1986).  Moreover, the defendant's efforts to exculpate himself by minimizing his role in the crimes support his capacity to voluntarily waive his Miranda rights.  See Commonwealth v. Jackson, 432 Mass. 82, 87 (2000).  Finally, the defendant had prior contact with the criminal justice system, including a previous arrest during which his Miranda rights were read to him -- experience that weighs in favor of a finding of voluntariness.  See Commonwealth v. Novo, 442 Mass. 262, 267 (2004).  In light of these facts, we accept the motion judge's conclusion that the defendant voluntarily waived his Miranda rights.
            We likewise find no error in the motion judge's determination that the defendant's post-Miranda statements were voluntary.  "A statement is presumed voluntary until a defendant produces any evidence showing otherwise," at which point the Commonwealth must prove voluntariness beyond a reasonable doubt.  Commonwealth v. Hart, 493 Mass. 130, 135 (2023).  A statement is involuntary if, under the totality of the circumstances, "the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act" (citation omitted).  Commonwealth v. Roman, 495 Mass. 412, 416 (2025).
            Although the voluntariness of a Miranda waiver and the voluntariness of subsequent statements are distinct inquiries, they are closely related and often turn on many of the same considerations.  Commonwealth v. Richards, 485 Mass. 896, 909 (2020), quoting Commonwealth v. Edwards, 420 Mass. 666, 673 (1995).  A critical additional factor is whether the police used coercive tactics during the interrogation.  Scoggins, 439 Mass. at 576.
            Here, the record provides no basis to conclude that the defendant's will was overborne.  In addition to the various factors detailed above, we also note the motion judge's finding that the interaction was noncoercive; indeed, the defendant was described as "calm . . . , responsive, . . . cooperative and articulate," and the detectives maintained a "low key and conversational" tone.  See Boyarsky, 452 Mass. at 715.
            Although the defendant asserts that the detectives engaged in impermissible "now or never" pressure, the record does not support that characterization.  That label applies where police falsely suggest that a defendant must speak immediately or lose the right to do so -- especially in a way that undermines the right to counsel or to testify.  See Commonwealth v. Miller, 486 Mass. 78, 92-93 (2020); Commonwealth v. Thomas, 469 Mass. 531, 542 (2014); Novo, 442 Mass. at 264 n.2, 269.
            Here, the detectives conveyed no such implication.  When the defendant requested to speak with the assistant district attorney, the officers attempted to honor that request.  They explained, accurately, that the opportunity for the defendant to provide his version of the events before arraignment might be more valuable at that time rather than by doing so later.  They also repeatedly emphasized that the decision whether to talk was the defendant's alone and that they would not proceed without the defendant's consent or if the defendant requested counsel.  Ultimately, when one of the detectives left the room to attempt to contact the assistant district attorney, the defendant voluntarily chose to speak and made several inculpatory statements.
            Accordingly, the motion judge did not err in concluding that the defendant's Miranda waiver and subsequent statements were voluntary.  Therefore, the denial of the motion to suppress was proper.
            2.  Jury instruction.  The defendant next argues that the trial judge erred by deviating from the "model" Superior Court jury instruction on armed home invasion, specifically as to the knowledge element.  The relevant instruction at the time provided that a defendant's act must be done "voluntarily and intentionally, and not because of mistake, accident, negligence or other innocent reason" (emphasis added).  Massachusetts Superior Court Criminal Practice Jury Instructions § 4.2, at 416 (Mass. Cont. Legal Educ. 2d. ed. 2013).  At trial, however, the judge instructed the jury that the act must have been done "voluntarily or intentionally" (emphasis added).  The defendant argues that this deviation diluted the Commonwealth's burden, allowing the jury to convict without necessarily finding that his conduct was voluntary -- an issue central to his defense.
            Because the defendant did not object at trial, we review the instruction to determine whether any error created a substantial likelihood of a miscarriage of justice.  See Commonwealth v. Alemany, 488 Mass. 499, 504 (2021).  To meet that standard, the error must have been likely to influence the jury's conclusion.  Commonwealth v. Miranda, 492 Mass. 301, 314 (2023).  In reviewing a jury instruction for error, we assess the instruction in its entirety, considering how a reasonable juror would understand its over-all meaning, rather than focusing on isolated words or phrases.  Roman, 495 Mass. at 427.
            Although the defendant emphasizes the deviation between the trial judge's instruction and the Massachusetts Superior Court Criminal Practice Jury Instructions, we generally do not evaluate a judge's instruction based on how closely it adheres to "model" instructions that have not been sanctioned by this court.  See Commonwealth v. Martinez, 487 Mass. 265, 274 (2021).  The Massachusetts Superior Court Criminal Practice Jury Instructions -- published in various editions -- may serve as a useful reference; however, they do not carry the authority of this court unless formally adopted.  Commonwealth v. Pfeiffer, 482 Mass. 110, 117 n.11, cert. denied, 140 S. Ct. 498 (2019), S.C., 492 Mass. 440 (2023) (distinguishing Model Jury Instructions on Homicide [2018], which were approved and recommended by this court).
            Unlike the Model Jury Instructions on Homicide and the Model Jury Instructions on Eyewitness Identification, 473 Mass. 1051 (2015), the Massachusetts Superior Court Criminal Practice Jury Instructions on armed home invasion have never been "reviewed or approved by our courts."  Pfeiffer, 482 Mass. at 117 n.11.  Accordingly, we decline to assess the challenged instruction based on its conformity to those instructions on armed home invasion.  Any potential error therefore lies not in the trial judge's failure to follow those instructions, but in the judge's use of disjunctive language as examined in light of the instruction's "over-all impact on the jury" (citation omitted).  Martinez, 487 Mass. at 274.
            Here, the trial judge's use of "or" rather than "and" was legal error.  See Alemany, 488 Mass. at 503-506 (judge's use of "and" instead of "or" constituted error of law).  However, this error did not give rise to a substantial likelihood of a miscarriage of justice.  The trial judge immediately followed the erroneous disjunctive language with an instruction clarifying that conduct done "knowingly" excludes acts committed by "mistake, accident, negligence, or other innocent reason."  This guidance properly distinguished culpable mental states from innocent ones and mitigated any risk of juror confusion.  Moreover, the remainder of the instruction accurately conveyed the governing law.  See Commonwealth v. Young, 461 Mass. 198, 210 (2012) ("The balance of the instructions conveyed the proper law"); Commonwealth v. Oliveira, 445 Mass. 837, 844-845 (2006) (minor misstatement within otherwise accurate instruction not reversible error).
            Additionally, the defendant's argument regarding the voluntariness of his actions closely tracks the same facts underlying his duress defense -- a defense on which the jury received proper, unchallenged instructions.[10]  Given their rejection of that defense, it is implausible that the jury, had they been properly instructed, would have concluded that the defendant's actions were involuntary.  Cf. Commonwealth v. Fletcher, 435 Mass. 558, 563–564 (2002) (no substantial likelihood of miscarriage of justice from erroneous malice instruction where jury rejected intoxication and insanity defenses).
            As a final point, the Commonwealth's case against the defendant was strong.  See Commonwealth v. Allen, 430 Mass. 252, 258 (1999).  The evidence -- including the defendant's own admissions -- placed him at the crime scene and demonstrated his active participation in the fatal confrontation.  Although he contested the voluntariness of his involvement, the defendant acknowledged that he agreed to participate in the armed home invasion to "make some money."  The defendant also directed his accomplices on how to proceed once inside, instructing them, "If you have to shoot, you shoot down."  After the shooting, he reprimanded one of the participants for failing to follow that instruction, even "smack[ing]" him.  Such conduct is inconsistent with that of someone coerced into committing the crimes.
            When viewed in context, any misstatement by the trial judge was minor and did not prejudice the defendant.  See Roman, 495 Mass. at 429.  Accordingly, we conclude that the challenged instruction did not result in a substantial likelihood of a miscarriage of justice.
            3.  Review under G. L. c. 278, § 33E.  Finally, the defendant urges this court to exercise its extraordinary authority under G. L. c. 278, § 33E, to reduce his felony-murder conviction or grant a new trial.  He contends that such relief is warranted in light of his purportedly limited role in the crimes, his medical and psychological history, and the comparatively lenient sentences imposed on his coventurers who pleaded guilty.
            Under § 33E, we are obligated to review the entire case to determine whether the verdict is "consonant with justice" (citation omitted).  Commonwealth v. Kostka, 489 Mass. 399, 419 (2022).  Although this power is substantial, it is not unlimited:  "[o]ur duty under § 33E does not . . . convert this court into a second jury" (quotation and citation omitted).  Commonwealth v. Salazar, 481 Mass. 105, 119 (2018).  After a thorough review of the record, we conclude that relief under § 33E is not warranted in this case.
            First, the defendant's contention that he played a minor role in the deadly home invasion is unavailing.  The evidence amply supports the jury finding that the defendant was a knowing and active participant in the home invasion.  As previously detailed, he agreed to take part in the robbery in exchange for a share of the proceeds, advised his coventurers on tactics, and later chastised them for the shooting.  He forcibly entered the victim's home, ordered the occupants to the ground, and engaged in a violent struggle with the victim.  Afterward, he expressed anger that his coventurers had failed to assist him, stating he would have "put one in the kid's foot."  This conduct places the defendant at the center of the criminal enterprise -- not at its "remote outer fringes."  Commonwealth v. Colon, 483 Mass. 378, 394 (2019).
            Second, while the defendant introduced evidence of lead poisoning, mental health diagnoses, and substance abuse history, the record does not demonstrate that the defendant was "driven by [his] mental condition" (citation omitted).  Commonwealth v. Welch, 487 Mass. 425, 446-447 (2021) (rejecting defendant's argument that mental illnesses, substance use disorders, and trauma demonstrated killing was spontaneous).  See, e.g., Commonwealth v. Concepcion, 487 Mass. 77, 95, cert. denied, 142 S. Ct. 408 (2021) ("Mental illness alone is generally insufficient to support a verdict reduction under [§ 33E]"); Commonwealth v. Kolenovic, 478 Mass. 189, 210 (2017) (mental impairment alone, whether caused by disorder or by severe intoxication, does not warrant § 33E relief).
            Finally, the fact that the other participants in the crimes received lesser sentences following guilty pleas does not, by itself, justify § 33E relief.  See Commonwealth v. Tillis, 486 Mass. 497, 509 (2020) ("a disparity in sentences returned by a separate jury for a more culpable accomplice is not enough, standing alone, to warrant relief" under § 33E); Commonwealth v. Pucillo, 427 Mass. 108, 116 (1998).
            Having reviewed the full trial record, we find no basis to disturb the jury's verdict or to exercise our authority under G. L. c. 278, § 33E.
Judgments affirmed.
footnotes

            [1] Frost, a certified emergency medical technician with extensive narcotics training, observed the defendant at about 7:50 A.M. that morning for purposes of determining whether he was under the influence.
            [2] A sally port is "a secure entryway (as at a prison) that consists of a series of doors or gates."  Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary
/sally%20port [https://perma.cc/3BU9-EPP6].
            [3] The Rosario rule, established in Commonwealth v. Rosario, 422 Mass. 48, 56 (1996), is grounded in the prompt presentment requirement of Mass. R. Crim. P. 7 (a) (1), as appearing in 461 Mass. 1501 (2012), which mandates that "[a] defendant who has been arrested and is not released shall be brought for arraignment before a court if then in session, and if not, at its next session."  See Commonwealth v. Powell, 468 Mass. 272, 275-276 (2014).  The Rosario rule establishes a six-hour "safe harbor" period following an arrest during which a defendant's statement is not subject to exclusion solely due to a delay in arraignment (citation omitted).  Id. at 278.  As this court explained in Rosario, supra, "[a]n otherwise admissible statement is not to be excluded on the ground of unreasonable delay in arraignment, if the statement is made within six hours of the arrest . . . or if . . . the defendant made an informed and voluntary written or recorded waiver of his right to be arraigned without unreasonable delay."
            [4] In a separate motion to suppress, the defendant contended that his rights pursuant to Rosario had been violated.  The motion judge rejected this argument in the same ruling.
            [5] When a jury return a guilty verdict on a theory of felony-murder, the predicate felony "merges into the felony-murder conviction as a lesser included offense."  Commonwealth v. Rivera, 445 Mass. 119, 132 (2005).  Where, as here, the felony-murder conviction is based on more than one felony, only one of the underlying felonies is duplicative requiring merger.  Commonwealth v. Rivera, 464 Mass. 56, 81-82, cert. denied, 570 U.S. 907 (2013).
            [6] As the defendant had been arrested the previous day, the parties do not dispute that he was in custody during the events in question.  See Commonwealth v. Medina, 485 Mass. 296, 301 (2020) (defendants subjected to formal arrest are in custody).
            [7] Because no Miranda violation occurred, we need not reach the Commonwealth's alternative argument that the sally port interaction did not lead to any inculpatory statements.  See Commonwealth v. Larkin, 429 Mass. 426, 437 (1999) (taint of earlier Miranda violation may be removed if pre-Miranda interview led to no inculpatory statement).  Regardless of whether the defendant's questions and remarks in the sally port -- which were not offered by the Commonwealth in evidence at trial -- could be construed as inculpatory, Frost was not required to interrupt these voluntary statements in order to recite Miranda warnings.  See Commonwealth v. Hilton, 443 Mass. 597, 612 (2005), S.C., 450 Mass. 173 (2007).  See also Miranda, 384 U.S. at 478.
            [8] The defendant argues that even an officer's statements of fact can amount to the functional equivalent of interrogation where the words are likely to elicit an incriminating response.  To support this argument, the defendant relies on Commonwealth v. Clark C., 59 Mass. App. Ct. 542, 546 (2003), and Commonwealth v. Chadwick, 40 Mass. App. Ct. 425, 428-429 (1996).  However, in those cases, the officers' factual statements could be viewed as either an attempt to identify the suspect as the same person who had previously made inculpatory statements over the telephone, Clark C., supra at 544-548, or a challenge to a defendant's denial that he committed a crime, Chadwick, supra.  Here, a reasonable person would not understand Frost's factual statement in such a manner.
            [9] The defendant also argues that Frost's actions in delaying the defendant's transport to court for prompt arraignment "despite the dictates of Rosario" and in "ignor[ing] departmental policies against smoking at the precinct" were also designed to elicit an incriminating response from the defendant.  Regarding the defendant's Rosario claim, while the motion judge made no findings as to Frost's reason for delaying the defendant's transport for arraignment or for allowing the defendant to smoke in the sally port, the judge concluded that the defendant's Rosario waiver was "knowing, intelligent and voluntary beyond a reasonable doubt."  These findings are dispositive as to the Rosario claim because "we have given effect to waivers of the right to prompt arraignment executed more than six hours after a defendant's arrest" so long as the waiver was "informed and voluntary."  Commonwealth v. Cartright, 478 Mass. 273, 286-287 (2017).  As to the defendant's claim that allowing him to smoke in the sally port was designed to elicit an incriminating response, regardless of whether this was a violation of police department policy, a topic on which the motion judge made no findings, the defendant is the one who initiated the request to smoke a cigarette.  See Koumaris, 440 Mass. at 409.
            [10] The defendant's theory at trial was that he participated in the venture under duress, fearing that he would have been killed had he not cooperated with the other participants.  The trial judge prefaced his instructions on the elements of duress by stating that "[i]n certain limited circumstances a person may be justified in the commission of an otherwise criminal offense because of duress, where the defendant did not act with free will," and that "[t]he exercise of free will is essential to the commission of a criminal act."  The judge also placed on the Commonwealth the burden of proving a lack of duress beyond a reasonable doubt.  Notwithstanding that the rationale behind the defense of duress does not hinge on whether a defendant has engaged in a voluntary act, Commonwealth v. Vasquez, 462 Mass. 827, 833 (2012), we note that the judge's instruction here included some of the same language as that in Commonwealth v. Robinson, 382 Mass. 189, 207 (1981), where voluntariness and duress were essentially melded together.